Francisco Cardona, peticionario, *v.* Corte de Distrito de Humacao, Hon. Luis Pereyó, Juez y otros, demandados.

Núm. 84.—*Sometido:* Abril 12, 1943. *Resuelto:* Mayo 18, 1943.

*José López Baralt y Juan E. Géigel,* abogados del peticionario; *Nico-lás Lecároz Largé, M. Avilés Bracero y Pedro Santana, Jr., Ofi-ciales Jurídicos del Departamento del Trabajo,* abogados de los obreros demandados; *E. Martínez Rivera, F. Fernández Cuyar, Bauzá & Bauzá, C. Ruiz Nazario, A. Ortiz Toro, E. Font Suárez, E. Martínez Avilés, F. M. Cadilla, G. Zeno Sama, Antonio Lens Cuena, Hartzell, Kelley & Hartzell y Rafael O. Fernández,* como *amicus curiae.*

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

De conformidad con la Ley núm. 10 de 1917· ((II) pág. 217), según ha sido enmendada, quince trabajadores agrícolas radicaron contra el peticionario ante la Corte Municipal de San Lorenzo querellas en reclamación de salarios. Sustancialmente estas querellas alegaban la existencia de un contrato verbal entre los demandantes y el peticionario al efecto de "Que el querellante prestaría sus servicios como carretero durante la zafra de cañas, por una compensación ·de $1.68 por día. Que durante 56 días trabajó 4 horas extras diariamente en exceso de las ocho horas regulares del día ordinario de trabajo, o sea, un total de 224 horas extras,

que, al tipo doble de salario, importan la cantidad de $94.08, cantidad que se niega a pagar . . . ''.

La Corte Municipal declaró sin lugar las querellas. Apeladas las querellas para ante la Corte de Distrito de Humacao, ésta declaró sin lugar las excepciones previas interpuestas contra las mismas, resolviendo que la Ley núm. 49, Leyes de Puerto Rico, Sesión Extraordinaria, 1935, (pág. 539) disponía el pago a los obreros de doble compensación por todas las horas trabajadas en exceso de ocho horas durante cualquier día. A solicitud de todas las partes aquí envueltas, expedimos un auto inhibitorio preliminar dirigido al juez de distrito (Véanse *Fortuna Estates* v. *Texidor, Juez de Dist.*, 26 D.P.R. 266; *P. R. Ry., Lt. & P. Co.* v. *Ortiz, Juez*, 59 D.P.R. 921; *Abelleira* v. *District Court of Appeal, Third District*, 109 P. (2d) 942 (Calif., 1941). Comentario, *Extent to Which Availability of Ordinary Remedy Defeats Issuance of Writ of Prohibition*, 22 Calif. L. Rev. 537.)

Nos confrontamos al comenzar con la contención de los obreros de que este caso debe regirse por el siguiente lenguaje que se encuentra en *Turney* v. *J. H. Tillman Co.*, 228 P. 933, a la pág. 937:

"Sin embargo, la querella no contiene alegación alguna de que el querellado infringió el estatuto en cuestión o cometió delito alguno. La presunción es, hasta que se demuestre lo contrario, que el querellado es inocente de delito o falta. Or. L. §799, subd. 1. El estatuto presume que las transacciones privadas se han desarrollado normalmente y en una forma justa y que se ha seguido el curso ordinario de los negocios. Or. L. §799, subds. 19 y 20. En ausencia de alegación alguna en contrario, debe presumirse al interpretarse la querella que el querellado cumplió con su deber y permitió o exigió a las partes mencionadas que trabajasen horas extras por razón de necesidad, emergencia o cuando la política pública absolutamente lo exigía, y que no había disponibles otros trabajadores de igual destreza y eficiencia que no hubieran sido empleados regularmente."

Si adoptáramos este punto de vista, no necesitaríamos ir más lejos para resolver el presente caso, toda vez que la Ley

núm. 49 claramente dispone la doble compensación por horas extras trabajadas durante una emergencia.

Estamos dispuestos—en verdad es nuestro deber bajo la sección 6 de la Ley núm. 10—a ser lo más indulgentes posible en cuanto a la cuestión de alegaciones, para que los obreros, sin perder sus casos debido a cuestiones técnicas, puedan tener un juicio en los méritos. Pero el aceptar nosotros tal presunción en este caso equivaldría a frustrar el propósito para el cual expedimos el auto. Todas las partes concurrieron al solicitar que expidiéramos el auto en este caso, afirmando que era de interés público el que esta corte trazara a las cortes inferiores la pauta a seguir en la resolución de miles de casos que envuelven reclamaciones ascendentes a millones de dólares provenientes de trabajo realizado en situaciones normales. Por tanto sería una actuación inútil de nuestra parte si resolviéramos este caso aceptando el argumento de que debemos presumir que, como una cuestión de alegación técnica, el trabajo aquí envuelto fué realizado mediante permiso y durante una emergencia. Si nuestra decisión en este caso va a servir de pauta en la resolución del problema que nos urgió a expedir el auto, debemos, fuera de cualquier teoría en cuanto a alegaciones, considerar el trabajo realizado como trabajo corriente. Por tanto, pasamos a determinar si la Ley núm. 49 dispone doble compensación por trabajo en exceso de ocho horas diarias bajo condiciones normales.

No puede haber duda que la Ley núm. 49 no es una ley de salarios, y que su único fin es limitar las horas de trabajo de un día normal. La historia legislativa de la Ley núm. 49 demuestra fuera de toda discusión que el Comisionado del Trabajo y la Legislatura actuaron movidos por el deseo (a) de mejorar la salud de los trabajadores y (b) de reducir el desempleo.[1] Fué sobre esta teoría que se

---

[1] "Creemos conveniente insistir respetuosamente ante ese Senado para que se apruebe el Proyecto de la Cámara número 2, tal como fué aprobado por la Cámara de Representantes, si existe en realidad el propósito de facilitar el programa de reformas constructivas y medidas que tiendan a absorber parte del personal desempleado.

sostuvo la constitucionalidad de la Ley núm. 49 en el caso

"...

"El Congreso Internacional del Trabajo acaba de establecer la semana de cuarenta horas, y la tendencia universal, como medida de alivio al desempleo, es reducir las horas en todas partes."

Actas del Senado de Puerto Rico, 1935, págs. 1212, 1213.

"La limitación de la jornada de trabajo favorece más a la industria que al mismo trabajador, porque le proporciona un descanso adecuado, y por lo tanto, predispone al elemento humano a realizar una labor más eficiente en la respectiva industria.

"Es nuestra aspiración y no dejaremos en demandarla constantemente ante esta Legislatura, que la jornada de trabajo en Puerto Rico debe ser rebajada en tales condiciones, que la industria pueda absorber una gran cantidad del brazo que está desocupado, que alcanza a más de 375,000 personas."

Actas de la Cámara de Representantes de Puerto Rico, 1935, pág. 1359.

"En casi todo movimiento en que el trabajador agrícola ha tomado parte para mejorar sus condiciones de vida y trabajo, la primera reclamación ha sido una jornada de ocho horas, que pocas veces se ha conseguido y si en muchas se ha puesto en los escritos de transacciones de los movimientos huelgarios, ello ha resultado letra muerta por no existir la debida y necesaria inspección y reglamentación legal que produjese el cumplimiento de los convenios firmados a tal efecto. Si este proyecto se convierte en ley, será innecesario desde su vigencia en adelante el exigir una jornada de ocho horas como condición al mantenimiento de la paz industrial porque los funcionarios encargados de hacer cumplir las leyes estarán prestos a así exigirlo, y el trabajador que se aviniera a trabajar más de ocho horas, o el patrono que exigiera que las trabajase, habría incurrido en las sanciones penales que determina el proyecto de ley. De modo, pues, que lo que ha sido un derecho discutible y discutido a través de las luchas del trabajo, se convertirá en un derecho positivo e inalienable, cuyo ejercicio y goce el Estado se encarga de garantizar.

"...

"Se ha comprobado que en la actualidad los trabajadores a quienes habrá de afectar esta eliminación, han estado trabajando por lo menos doce horas diarias durante los siete días de la semana, y no es difícil darse cuenta por cualquier persona que observe y estudie con calma las disposiciones de esta ley, que constituye una gran ventaja y una conquista digna de tenerse en cuenta y de esforzarse por conservarla, el hecho de que inmediatamente que el proyecto empiece a regir nadie tendrá la obligación, ni podrá siquiera voluntariamente, rendir una jornada de labor más allá de las ocho horas, a menos que situaciones de emergencia declaradas según se determina en el proyecto, pudieran existir.

"...

"Si la ley dictada se convirtiera en la ley de esta Isla sobre la materia, han conseguido las masas trabajadoras lo que ha costado numerosas vidas y podría continuar costándolas, si no hubiéramos, mediante la adopción del proyecto en la forma en que se ha votado definitivamente por el Senado, eliminado la más difícil contención de las demandas de los obreros en su lucha por un mejor estar y mayores oportunidades de trabajo.

"... "

Actas del Senado de Puerto Rico, 1935, págs. 1336-1340.

de *M. Taboada & Co.* v. *Rivera Martínez, Comisionado,* 51 D.P.R. 253. Nunca se tuvo la intención de regular, a través de esta ley, los salarios devengados bajo condiciones normales. En verdad, el esfuerzo de una Legislatura anterior para proveer tal ley de salario mínimo para las mujeres, fué frustrado temporalmente, no por esta corte (*El Pueblo* v. *Alvarez,* 28 D.P.R. 937), sino por una decisión de la Corte Suprema de los Estados Unidos (*Adkins* v. *Children's Hospital,* 261 U. S. 525; *El Pueblo* v. *Laurnaga & Cía., Sucrs., S. en C.,* 32 D.P.R. 831). No obstante haberse revocado el caso de *Adkins* en 1937 por el de *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379, cuando la Ley núm. 49 fué aprobada en 1935 todavía regía el caso de *Adkins.* Después que la doctrina de que un Estado no podía aprobar una ley de salario mínimo fué descartada totalmente en 1937 por el caso de *Parrish,* esta corte en 1940 volvió a su posición original declarando válida la ley de salario mínimo para mujeres (*Irizarry* v. *Rivera Martínez,* 56 D.P.R. 519), y la Legislatura en 1941 emprendió la tarea de levantar el armazón para la reglamentación general del salario mínimo (Ley núm. 8, Leyes de Puerto Rico, 1941 (1) pág. 303). Pero la Ley núm. 49, según fué aprobada por una Legislatura del 1935, que tenía conocimiento de las limitaciones a que ella y esta corte estaban sujetas contra la legislación sobre salarios mínimos, no contenía disposición alguna en cuanto a salario como tal.

Al hacer esta afirmación, no pasamos por alto la disposición de la sección 1 de la Ley núm. 49 en cuanto a doble compensación por la novena hora y por horas extras trabajadas durante una emergencia. Pero ésta no es una disposición sobre salarios; es una manera de asegurar el cumplimiento de la disposición limitando las horas de trabajo. Un estatuto de Oregón similar al nuestro fué declarado válido en *Bunting* v. *Oregón,* 243 U. S. 426, por el fundamento de que era un estatuto limitando las horas y no fijando salarios.

En aquella época, como hemos visto, el punto de vista prevaleciente en la Corte Suprema de los Estados Unidos era al efecto de que un estatuto que reglamentaba los salarios sería inconstitucional. La Corte Suprema específicamente rechazó la contención en el caso de *Bunting,* que los obreros también suscitan aquí, al efecto de que la disposición sobre horas extras era en efecto una ley sobre salarios y no una ley sobre horas de trabajo. La corte dice a las págs. 436, 7: "Existe cierta plausibilidad verbal en la contención de que se intentó permitir el trabajo durante 13 horas, de existir compensación por 15½ horas, pero al reflexionar, la plausibilidad desaparece. La disposición sobre horas extras es permisiva, de la misma manera que puede decirse que cualquier penalidad es permisiva. Su propósito es desalentar la práctica mediante la carga que ello conlleva, y su suficiencia para esto fué una cuestión de discreción legislativa bajo las circunstancias concurrentes. Puede no lograr sus propósitos pero su insuficiencia no puede cambiar su carácter de penalidad a permiso." La Corte Suprema por tanto aceptó lo resuelto por la Corte Suprema de Oregón al efecto de que (pág. 435) " 'el propósito del estatuto es fijar las horas máximas de trabajo en ciertas industrias. La ley no intenta fijar el *standard* de salarios. No se habla de salario máximo o mínimo. Eso se dejó enteramente a las partes contratantes.' "

Como en el estatuto de Oregón, nuestra disposición en cuanto a trabajo extra en caso de emergencia, al igual que el permiso incondicional para trabajar tres horas extras en Oregón, es parte integrante de la disposición sobre limitación de horas. El estatuto de Oregón establecía como máximo un día de diez horas de trabajo, pero con el disponiéndose de que se podrían trabajar tres horas adicionales si se pagaba tiempo y medio. Nuestra Legislatura pudo haber pensado que era más progresista que la de Oregón al insistir que no se podía realizar trabajo alguno después del máximo fijado para un día, so pena de sanción penal, excepto

durante emergencias que fueron definidas cuidadosamente, las cuales probablemente no serían simuladas, debido a la desalentadora disposición de doble compensación. Aun cuando una manera más efectiva de evitar el trabajo extra podría ser más bien que prohibirlo, legalizarlo, pero con doble compensación, el hecho es que el primer medio fué el utilizado por nuestra Legislatura.

Cuando un proyecto similar a la Ley núm. 49 fué aprobado originalmente en la sesión ordinaria de 1935, el Gobernador lo vedó debido a su inflexibilidad al dejar de disponer que durante emergencias podía permitirse el trabajo extra. Y cuando durante la sesión extraordinaria de 1935 se corrigió este defecto, en la Ley núm. 49 que autoriza el trabajo extra durante emergencias, fué para salvaguardiar contra exceso de indulgencia de parte del gobierno al conceder tales permisos, que se insertó en la ley la disposición de doble compensación por trabajo realizado durante tales emergencias. Pero tanto la historia legislativa como la ley en sí son claras al efecto de que la Legislatura no disponía trabajo extra sin limitación, siempre y cuando que se pagase por él doble de lo que se pagaba por trabajo ordinario. En verdad, tal disposición, a menos que lograra desalentar tal empleo, hubiera resultado en una contradicción directa a los propósitos que se expusieron en la ley; es decir, la salud de los obreros, y la distribución del trabajo existente entre todos los más posibles obreros. El trabajar doce horas diarias como práctica ordinaria, aun cuando se recibiese paga extra por las últimas cuatro horas, no beneficia la salud. Y el permitir que un hombre trabaje doce horas, en vez de relevarlo después de ocho horas y dejar que otro ocupe su puesto, no alivia el desempleo.

De la discusión que precede es obvio que la Ley núm. 49 no cubre en el terreno insular el mismo campo o usa el mismo método de afrontar el problema que la *Fair Labor Standards Act* de 1938 (52 Stat. 1060) en la esfera Federal. En primer lugar, como ya se ha indicado, en la Ley núm. 49 no

existe, como en la Ley Federal, disposición alguna para trabajo normal por salarios mínimos. A no ser porque los convenios colectivos lo impiden, bajo la Ley núm. 49 podrían pagarse con impunidad salarios de hambre. De acuerdo con tal sistema un obrero encontraría poco beneficio en recibir doble compensación por tiempo extra. Si se trabajan, por ejemplo, ocho horas al día a un tipo estipulado de dos centavos la hora, cuatro centavos la hora por las siguientes cuatro escasamente puede ser considerado como un paso de avance en la emancipación del obrero.

La segunda diferencia importante entre la Ley núm. 49 y la Ley Federal es que la ley Federal cuenta con más de un medio para ponerla en vigor. La Ley núm. 49, como hemos visto, tiene como único propósito limitar las horas de trabajo. Éste es también uno de los propósitos del estatuto Federal. Pero la Ley Federal, aprovechándose de la experiencia adquirida bajo estatutos locales, el de Puerto Rico inclusive, adopta un método diferente y más efectivo de afrontar el problema. Las leyes que afectan al obrero producen una honda huella en la comunidad. Al ser redactadas como una medida de policía, con sanciones penales exclusivamente, han resultado ser difíciles, si no imposibles, de ser puestas en vigor. Se descubrió que estatutos que afectan todo hogar y toda empresa comercial nunca pueden ser puestos en vigor total y efectivamente si sólo contienen sanciones penales. La legislación posterior dió con una fórmula para ponerlos en vigor que virtualmente trabaja por sí misma y que puede probar ser infalible. Este principio se halla en aquella parte de la *Federal Fair Labor Standards Act* que, en vez de declarar un delito por parte de los patronos el exigir de sus empleados que trabajen en exceso de la limitación estatutaria, no dispone límite alguno para ello, pero incluye sin embargo la disposición pragmática de que el tiempo trabajado en exceso de la limitación estatutaria debe ser compensado al tipo de tiempo y medio tomando como base el tipo corriente de compensación (29 U.S.C. §207). Este aspecto de

la Ley Federal es tanto una disposición de tiempo máximo como lo es la Ley núm. 49 (*United States* v. *Darby,* 312 U.S. 100, 125; *Overnight Motor Co.* v. *Missel,* 316 U.S. 572, 576–8). La única diferencia es que la acción civil del obrero para que se le pague a tiempo y medio sustituye la persecución criminal como la cuña para ponerla en vigor. La salud de los obreros se conserva y el trabajo se distribuye desalentando el trabajo extra, no por medio de persecución criminal, sino haciéndolo prohibitivo por su alto costo. Las acciones de triple daño de los consumidores bajo la *Federal Emergency Price Control Act* (50 U.S.C. §925(*e*)) es un ejemplo similar de la manera por la cual, o se ha abandonado la filosofía de la persecución criminal solamente, como un método de hacer que se cumplan los estatutos reguladores, o ésta ha sido reforzada por las acciones civiles privadas entabladas por las personas perjudicadas. Las sanciones penales, por lo menos por sí solas, simplemente han dejado de probar que son un impedimento efectivo en este campo.

El *Fair Labor Standards Act* es enteramente práctico. Sabiamente echó a un lado el esfuerzo de prohibir criminalmente el que se trabaje horas extras; sólo dispuso que los patronos deben pagar tiempo y medio por tal trabajo extra —y el no pagar por ello, no el trabajo propiamente dicho, era lo que constituía el delito (29 U.S.C. §216(*a*)). Además, el derecho a tal compensación extra fué reforzado por una disposición concediendo daños líquidos adicionales ascendentes al total de la compensación extra en caso de que ésta no se pagase originalmente (29 U.S.C. §216(*b*)). Un patrono, cobijado por unas sanciones civiles tan efectivas, pondrá poca atención a la posibilidad de persecución criminal. La amenaza de la acción civil, más daños líquidos, serán el verdadero impedimento. Nuestra Legislatura en 1941 cogió prestada una disposición del estatuto Federal y dispuso en la sección 25 de la Ley núm. 8 de 1941 ((1) pág. 303) creando la Junta de Salario Mínimo, la acción civil del obrero en re-

clamación de su salario "más una suma igual al cincuenta (50) por ciento de las cantidades dejadas de satisfacer por concepto de penalidad adicional".

Pero cuando nos referimos a la Ley núm. 49 de 1935 encontramos disposiciones enteramente diferentes a aquellas contenidas en el estatuto Federal que acabamos de discutir. La sección 1 dispone solamente que "A ninguna persona se le empleará o se le permitirá que trabaje en ningún establecimiento comercial, industrial, agrícola o en cualquier otro negocio lucrativo, más de ocho (8) horas durante cualquier día natural, excepto cuando ocurriere cualquier evento extraordinario, o cualquiera emergencia causada por fuego, hambre o inundación, por peligro a la vida, a la propiedad, a la seguridad o salud pública, o en cualquiera otra circunstancia especial, siempre que el Gobernador de Puerto Rico, por recomendación del Comisionado del Trabajo declarare subsiguientemente que las disposiciones de esta Ley no deberán aplicarse a estos casos excepcionados y que por lo tanto las infracciones cometidas han sido excusables; *Disponiéndose,* que la limitación de ocho (8) horas establecida por esta sección, y en todos los trabajos normales, fuera de las excepciones ya anotadas, puede ser ampliada a un período que no excederá de nueve (9) horas durante cualquier día natural, a condición de que a toda persona de ese modo empleada a salario, jornal o en otra forma, por más de ocho (8) horas durante cualquier día natural, se le pagará por el trabajo que haga durante tal período extra, a un tipo que sea doble del salario que se le esté pagando por hora de trabajo precedentes." La sección 8 dispone que todo patrono que infrinja la Ley núm. 49 será culpable de *misdemeanor.*

Inmediatamente surge claro el hecho que la Ley núm. 49, al igual que algunas antiguas leyes estatales, descansó en la amenaza de cárcel o multa para hacer que el patrono cumpliese con ella. El estatuto categóricamente prohibe un día normal de trabajo que exceda de ocho horas, so pena de cár-

cel o multa. Guarda silencio en cuanto a sanciones civiles en beneficio del obrero. Sin embargo, los obreros en este caso afirman que puede inferirse la disposición para tales sanciones civiles, a manera de doble compensación por trabajo normal en exceso de ocho horas diarias, de las palabras de la Ley núm. 49, especialmente cuando se tienen en cuenta los propósitos de la ley y cuando ésta se lee junto a otros dos estatutos. Pasamos por tanto a considerar esos dos estatutos.

El artículo 553 del Código Penal, según quedó enmendado por la Ley núm. 306, Leyes de Puerto Rico, 1938 ((1) pág. 578), dispone que los establecimientos comerciales e industriales, con ciertas excepciones específicas, permanecerán cerrados al público todo el día domingo, y cerrarán desde las 12 m. los días de fiesta legal, a las 9 p. m. los sábados, y a las 6 p. m. los días laborables. Y "una hora después de cerrados, no se permitirá ninguna clase de trabajo . . . ". La única disposición en cuanto a su ejecución consiste de una pena criminal de multa o cárcel para los patronos que infrinjan la ley. Por consiguiente, no puede ciertamente existir teoría alguna sobre la cual podamos resolver que este estatuto, por sí solo, específicamente dispuso *doble* compensación por trabajo realizado en violación del estatuto.

La Ley núm. 80, Leyes de Puerto Rico, 1931 (pág. 497), según fué enmendada por la Ley núm. 24, Leyes de Puerto Rico, 1935 ((1) pág. 189), autoriza al Comisionado del Trabajo para conceder permisos a los patronos en establecimientos comerciales o industriales para emplear personas en las horas extras del día o de la noche con el fin de terminar trabajo urgente o necesario que debe efectuarse dentro de un período determinado. Este estatuto dispone un tipo doble de compensación por cada hora así trabajada. La Ley núm. 80 evidentemente fué el producto de la experiencia adquirida bajo el artículo 553. Habiéndose descubierto que era en beneficio de toda la comunidad el permitir que tales

establecimientos permanecieran abiertos para poder terminar el trabajo bajo ciertas circunstancias especiales, se dispuso que se podía obtener temporalmente la suspensión de la ley mediante permiso del Comisionado. Pero para proteger al trabajador contra indulgencia excesiva del Comisionado hacia los patronos, la ley dispone doble compensación por tal trabajo. Como resultado, un patrono no estaría dispuesto a solicitar un permiso excepto en un caso *bona fide* de emergencia.

Cuando posteriormente se aprobó la Ley núm. 49 en la Sesión Extraordinaria de 1935, la Legislatura específicamente dispuso en la sección 7 que la Ley núm. 80 y el artículo 553 del Código Penal, tal como fueron enmendados, continuarían en vigor. De esta manera la Legislatura preservaba a los obreros las conquistas hechas al amparo de dichas leyes en cuanto a la hora del cierre, al mismo tiempo que establecía en la Ley núm. 49 un principio similar en relación con el máximo de horas diarias que podían ser trabajadas. Un ejemplo que viene en seguida a la mente sería el de un obrero a quien, aunque no estuviera obligado a trabajar más del máximo de ocho horas dispuesto en la Ley núm. 49, se le exigiese que trabajase, debido a una emergencia, después de la hora del cierre fijada por el artículo 553.

Cuando se aprobó la Ley núm. 49, la Legislatura tenía conocimiento, debido a la experiencia adquirida al amparo del artículo 553 y al veto del Gobernador a un proyecto similar, de que una limitación inflexible de las horas no podía hacerse. Por tanto dispuso, en adición a las situaciones de emergencia provistas en la sección 1, que (Sección 2) "En los casos en que existiere la amenaza de perderse una cosecha por falta de brazos, o de que no hubiere suficiente personal disponible para despachar un embarque de frutas o de cualquiera otro producto perecedero, el Gobernador de Puerto Rico, mediante recomendación del Comisionado del Trabajo, podrá suspender temporalmente para tales casos específicos los efectos de esta Ley en cuanto a la limitación de horas,

pero no así en cuanto al tipo de jornal doble que se establece como pago por las horas que se trabajaren en exceso de las ocho (8) horas diarias de labor que fija esta Ley.''

No puede haber duda en cuanto a que a través de las Leyes núms. 49 y 80 surge la clara y persistente intención de parte de la Legislatura de que los obreros reciban doble compensación por tiempo extra trabajado bajo las condiciones expresadas en cada una de ellas. Tomamos conocimiento judicial de que tales emergencias han ocurrido desde la fecha en que se aprobaron los estatutos, y que se han invocado los poderes de emergencia del Gobernador en ellos contenidos. Pero ésta es una ilustración gráfica del hecho de que, aparte de tales emergencias, todavía tenemos un simple estatuto categóricamente prohibitorio. Nuestra dificultad aquí consiste en que ambas partes admitieron en la vista que en este caso no existían emergencia o circunstancias especiales, y que virtualmente todos los casos que se regirán por nuestra decisión en este caso envuelven trabajo normal. Para conceder a los obreros doble compensación, debemos referirnos a los estatutos. Y la Legislatura, al no tomar en consideración que podría crearse esta situación, no proveyó para ella expresamente. Cuando miramos hacia atrás puede quizá argüirse que hubiera sido más efectivo si la Legislatura hubiera provisto, como en la Ley Federal, el pago de tiempo extra, y dispuesto que el delito fuera la negativa a efectuar tal pago, en vez del trabajo en sí. Indudablemente esto prueba ser más efectivo para evitar el trabajo extra que la prohibición absoluta acompañada de la sanción penal. Pero si el estatuto tiene que ser redactado de nuevo usando ese método más efectivo de hallarle solución a la situación reinante, debe hacerlo la Legislatura y no nosotros.

Leyendo el estatuto tal cual fué redactado en vez de como la experiencia dice debió leer, encontramos que en cuanto a trabajo ilegal, el estatuto sigue siendo un estatuto penal. La única disposición en cuanto a compensación por trabajo extra cubre trabajo extra que es legal. Inmediatamente surge

la pregunta, ¿si uno *gana* doble compensación por trabajo extra legal, por qué no puede inferirse del estatuto la implicación, prescindiendo ·de la sanción penal impuesta sobre el patrono al éste exigir trabajo extra ilegal, que todo trabajo extra, bien sea legal o ilegal, debe pagarse al doble tipo de compensación?

La dificultad consiste aquí en que el obrero, estrictamente hablando, no se gana la doble compensación. Sin duda es realmente duro para un obrero, trabajar horas extras, y tiene derecho a creer cuando se le ha pagado tiempo doble por tal tiempo extra, que se ha ganado tal compensación. Pero la Ley núm. 49 es un estatuto general que afecta toda clase de obreros—agrícolas, comerciales, industriales. Tomamos conocimiento judicial de que en Puerto Rico la abrumadora mayoría de tales obreros no tiene especialización, y que bajo nuestras condiciones crónicas de desempleo, pueden ser sustituídos con mucha facilidad. Haciendo tal relevo de obreros a la novena hora eliminaría la necesidad de pagar doble tiempo. Por tanto, se hace aparente que bajo las circunstancias existentes el pagar tiempo doble es un impedimento y. no, hablando estrictamente, compensación propiamente dicha por los servicios rendidos, según son fijados por los tipos que rigen para tales servicios. En verdad, hablando objetivamente, un obrero cansado, que está sujeto a un riesgo mayor de accidente, quizá vale menos que el tipo corriente de compensación, en vez de valer el doble. En ese sentido, la Legislatura estaba legislando en bien del interés de toda la comunidad cuando ordenó que el obrero cesara de trabajar en ese momento. De cualquier modo, el factor concluyente en este caso es que cuando la Legislatura intervino con la situación e impuso deberes estatutarios al patrono, interfirió con la libre contratación entre él y sus obreros en cuanto a compensación por horas extras. Hacemos constar claramente que bajo circunstancias adecuadas la Legislatura tiene todo derecho a aprobar una disposición razonable para el

pago de compensación por horas extras. Pero cuando deja de hacerlo, no podemos arrogarnos la realización de tal función legislativa.

No constituye contestación a esta dificultad el decir que la disposición por doble compensación no es una penalidad. Ciertamente no es una penalidad en el sentido tradicional de castigo por una ofensa contra el Estado. "Los estatutos que confieren una acción privada contra el culpable, muchas veces son considerados como de naturaleza penal, pero en tales casos . . . ni la responsabilidad impuesta ni el remedio conferido son estrictamente penales" (*Huntington* v. *Attrill,* 146 U. S. 657, 67). El Congreso empleó la frase "daños líquidos" en la *Fair Labor Standards Act,* y la Corte Suprema de los Estados Unidos ha resuelto que tales daños líquidos "son una compensación, no una penalidad o castigo por parte del Gobierno" (*Overnight Motor Co.* v. *Missel,* 316 U. S. 572, 83). Al mismo efecto, *Cox* v. *Lykes Brothers,* 143 N.E. 226 (N.Y. 1924); *Atchison, etc., Ry.* v. *Nichols,* 264 U.S. 348. Sin embargo, el Juez Cardozo, hablando a nombre de la Corte de Apelaciones de Nueva York, revela la naturaleza híbrida de tal disposición indicando en el caso de *Cox* que (pág. 827) "la misma disposición [doble salario por negarse a pagarle a un marino a tiempo] puede ser penal en cuanto al infractor y reparadora en cuanto al perjudicado". (Materia en corchetes nuestra.) De cualquier modo, bien se consideren como penales o no, disposiciones concediendo tal remedio civil, ya se llamen daños "punitivos" (*Minneapolis Railway Co.* v. *Beckwith,* 129 U. S. 26, 34), daños "ejemplares" (*James-Dickinson Co.* v. *Harry,* 273 U. S. 119) o, como en la *Fair Labor Standards Act,* daños "líquidos", en ausencia de legislación específica a ese efecto, no hay derecho a recobrarlos. Por lo menos hasta ese extremo, tales sanciones civiles privadas deben equipararse (*assimilated to*) a una penalidad. Esto se hace patente en el mismo caso en que los obreros descansan aquí. En *Turney* v. *J. H. Tillman Co.,* 228 P. 933 (Ore.; 1924) la corte dijo a la pág. 935 "La

disposición del estatuto . . . de que la persona así empleada [durante una emergencia] recibirá doble paga por tal tiempo extra, tiene evidentemente la intención de actuar como un impedimento que sirva de freno al patrono al exigir a tales obreros que trabajen tiempo extra. Es algo así como una penalidad por un aparente cambio en la regla general en adición a la penalidad [criminal] provista para ello. . . . '' (Materia en corchetes nuestra.) De igual manera, en *Bunting* v. *Oregón,* 243 U. S. 426, aun donde el tiempo extra es legal, la corte dijo a la pág. 436 ''La disposición sobre horas extras es permisiva, de la misma manera que puede decirse que cualquier penalidad es permisiva. Su propósito es desalentar . . . ''. Y nuestra propia Legislatura dispuso en un estatuto más reciente que la negativa a pagar al obrero el salario mínimo establecido de conformidad con la misma le daba derecho a demandar en reclamación de tales salarios ''más una suma igual al cincuenta (50) por ciento de las cantidades dejadas de satisfacer por concepto de penalidad adicional . . . ''. (Sección 25, Ley núm. 8, Leyes de Puerto Rico, 1941).[2]

Cuando examinamos la ley sobre penalidades, encontramos que las penalidades deben ser tan claras y tan expresas que deben surgir a primera vista. Ninguna regla en derecho está mejor establecida que la regla de que las penalidades deben ser expresas y no pueden inferirse. Pero la única penalidad provista en la Ley núm. 49 para aquellos patronos que ilegalmente emplean obreros después de nueve horas es la disposición penal. Es posible que la experiencia haya demostrado que un estatuto como éste demanda la sanción civil de doble compensación en vez de una absoluta prohibición penal. Admitimos sin ninguna discusión que la más efectiva manera de poner en vigor la Ley núm. 49 sería permitir al

---

[2] Quizá es innecesario añadir que cualesquiera referencias a la Ley núm. 8 de 1941 en esta opinión han sido sencillamente a manera de ejemplo. No sería propio de nuestra parte en este caso pasar sobre el alcance o validez de tal estatuto o de cualquier disposición del mismo.

obrero reclamar doble compensación por horas extras. Pero esto no altera el hecho de que la Legislatura todavía así no lo ha dispuesto. Esto no es sencillamente una hendedura en la coraza protectora del estatuto. Es una laguna en el estatuto; el llenarla está fuera del poder de las cortes, las cuales sólo pueden legislar en los intersticios (*Ballester* v. *Tribl. de Apelación,* 60 D.P.R. 768, 779).

Recientemente hemos resuelto que, no importa cuán malamente se necesite una penalidad para beneficio del interés público, no tenemos poder para colocarnos en la posición de la Legislatura e imponer tal penalidad (*American RR. Co.* v. *Comisión Industrial,* 61 D.P.R. 314). Del mismo modo, no importa cuán rigurosa parezca una penalidad, una vez que es impuesta clara y constitucionalmente por la Legislatura, no podemos mitigar los castigos provenientes de la misma circunscribiendo el alcance de la penalidad (*General Motors Acc. Corp.* v. *Brañuela et al.,* 61 D.P.R. 725, resuelto el 5 de abril de 1943), aunque consideramos cada situación cuidadosamente con el fin de determinar si la Legislatura tuvo la intención de imponer la penalidad de que se trataba (*West India Oil Co. (P. R.)* v. *Tesorero,* 61 D.P.R. 782, resuelto el 15 de abril de 1943). En dos palabras, una penalidad incluída en un estatuto por la Legislatura no será rechazada por esta corte; y una penalidad no incluída en un estatuto no será invocada o inferida por esta corte.

El peticionario cita varios casos similares al presente en los cuales se denegó la reclamación, bien por paga ordinaria o doble. Estos casos se señalarán más adelante en nuestra discusión de la alegada responsabilidad del patrono por el tipo de compensación ordinaria para horas extras. Los obreros descansan primordialmente en *Turney* v. *J. H. Tillman Co.,* 228 P. 933 (Ore., 1924), en el cual se concedió doble compensación. Nuestra dificultad con dicho caso tiene dos aspectos. En primer lugar, allí el peticionario alegó que el demandado (págs. 933–4) "se dedicaba a cierto trabajo para

el estado, de conformidad con un contrato escrito con el estado de Oregón, para la construcción y pavimentación de ciertas carreteras estatales cerca de Seaside, en el estado de Oregón; y para beneficio de todos los obreros empleados en dicho trabajo se insertó en el contrato una disposición especial al efecto de que ocho horas constituirían un día de trabajo y que todos los obreros en dicha obra que rindieran trabajo o labor en exceso de ocho horas diarias serían compensados por ello sobre la base y al tipo de doble paga por todo el excedente o tiempo extra sobre ocho horas diarias o turno nocturno.''

Por tanto, tenemos una situación en la cual, aparte de cualquier disposición estatutaria, había un contrato para pagar doble por horas extras. En el presente caso los obreros, aún cuando alegan la existencia de un contrato, descansan en la Ley núm. 49 para justificar compensación doble por horas extras, y no en contrato específico alguno a ese efecto. Y, como hemos visto, la Ley núm. 49 guarda silencio en cuanto a la cuestión de doble compensación por horas extras trabajadas bajo condiciones normales.

En segundo lugar, el estatuto en el caso de *Turney* prohibía que se trabajara por más de ocho horas (pág. 934) ''excepto en casos de necesidad, emergencia, o cuando la política pública absolutamente lo exigía, caso en el cual la persona o personas así empleadas para trabajar horas en exceso recibirán doble compensación por el tiempo extra trabajado; y no se presumirá que existe emergencia, necesidad o política pública cuando hay disponibles otros obreros ·de igual destreza y eficiencia, que no han trabajado durante horas ordinarias''.

Aparentemente no existía requisito alguno en dicho estatuto en cuanto a obtener permiso de un funcionario gubernamental para trabajar durante una emergencia. Si surgía la emergencia simplemente se trabajaba. Bajo tales circunstancias, la corte resolvió, como ya se ha indicado, que una

emergencia, como cuestión de alegaciones, se presumiría. Pero aquí, toda vez que nuestro estatuto exige un permiso, aun durante una emergencia, con el fin de que el trabajo extra sea legal, no creemos propio presumir la emergencia. Además, como ya hemos indicado, aunque en realidad pende un solo caso ante nos, la expedición del auto en este caso estaba predicada en condiciones en las cuales no estaba envuelto elemento de emergencia alguno. Por tanto, preferimos, con el fin de dar a nuestra decisión algún valor práctico, tratar el trabajo realizado como normal, y en su consecuencia realizado en violación de la Ley núm. 49.

Creemos propio indicar que el caso de *Turney* no basó su resolución exclusivamente en la presunción de emergencia. Basó su decisión en el fundamento adicional de que el estatuto fué concebido para proteger al obrero, y que por tanto éste debería recobrar doble compensación aunque no existiera emergencia alguna, caso en el cual el trabajo era ilegal. Sin embargo, aun bajo esta teoría, no nos confrontamos en nuestro caso, como en el de *Turney,* con un contrato específico que proveía doble compensación por todo trabajo extra. La franqueza nos obliga a añadir que aun en la hipótesis de que el caso de *Turney* descasara en el estatuto en vez de en el contrato, no podemos, como ya indicamos, encontrar tal disposición específica en nuestro estatuto en cuanto a trabajo extra bajo condiciones normales.

Por lo tanto resolvemos que, en ausencia de una disposición estatutaria específica que provea doble compensación por trabajo normal realizado después de la novena hora, esta Corte no puede redactar de nuevo la Ley núm. 49 y crear tal obligación.

■ El patrono pretendería que negásemos al obrero el derecho a reclamar compensación al tipo ordinario por horas trabajadas en exceso del mínimo estatutario. Bajo la teoría de que los obreros están *in pari delicto* con el patrono, trata de persuadirnos de que debemos dejar a las partes

donde las encontremos. Pasamos por tanto a examinar el estatuto con el fin de determinar si los obreros están *in pari delicto.*

La Ley núm. 49 dispone en su sección 1 que "A ninguna persona se le empleará o se le permitirá que trabaje" más de ocho horas diarias. A primera vista parecería, como alega el peticionario, que la frase "o se le permitirá que trabaje" es una prohibición dirigida a la conducta del obrero. Pero cuando examinamos el estatuto en su totalidad, y encontramos que bajo la sección 8 solamente el patrono puede ser perseguido por infracciones de la ley, y que la definición de un patrono que se encuentra en la sección 4 incluye administradores y capataces, llegamos a la conclusión, particularmente si tenemos en cuenta que el propósito de la ley es en primer lugar beneficiar a los obreros y a través de ellos a la comunidad en general, que la frase en cuestión está dirigida únicamente al patrono, y está concebida para hacer que el lenguaje que regula su conducta sea lo más amplio posible, de manera que no pueda el patrono, mediante la interposición de un intermediario—tal como un capataz—entre él y el obrero, evadir la responsabilidad. Llegamos a este mismo resultado, como lo han hecho otras cortes estatales, al interpretar un lenguaje similar en *Montaner* v. *Comisión Industrial,* 54 D.P.R. 67, 69.

El peticionario alega, no obstante, que aun cuando se resolviese que los obreros no están, hablando estrictamente, *in pari delicto* con sus patronos, en este caso los obreros no debieran recobrar. Examinemos por tanto esta contención.

El derecho civil y la ley común están de acuerdo al sostener que, hablando en términos generales, los convenios ilegales son nulos y que un contrato otorgado en violación de un estatuto está en contra de la política pública y no puede ser puesto en vigor por ninguna de las partes. (Art. 1227, Código Civil, Edición 1930; *Restatement, Contracts,* Sección 598; 5 Williston *on Contracts, Revised Ed.,* §1630.) Pero una vez más, como ocurre frecuentemente en derecho, encon-

tramos una proposición general que no brinda automáticamente la contestación a un problema específico. Puede admitirse inmediatamente que las cortes no pondrían en vigor un contrato de empleo por ejecutar, cuyos términos disponían la comisión de un delito por el patrono en violación de la Ley núm. 49. Pero aquí no nos confrontamos con poner en vigor un contrato ilegal. En el presente caso el contrato, asumiendo que alguna vez existiera, ha sido debidamente cumplido por una parte. Bajo tales circunstancias, ¿debemos dejar a las partes donde las encontramos, o debemos permitir que el obrero recobre el valor de servicios que ha prestado a un patrono que nada ha pagado por ellos?

El propio estatuto no ofrece una contestación explícita a esta pregunta. La Legislatura pudo haber dado el paso drástico de impedir la reclamación. O pudo haber dispuesto específicamente que la responsabilidad criminal del patrono no produciría *ipso facto* inmunidad civil. Pero la Legislatura no insertó ninguna de estas disposiciones en el estatuto. Bajo tales circunstancias, afirmar que éste es un contrato nulo y que las cortes no se prestarán a ponerlo en vigor es sencillamente exponer una frase hecha (*shibboleth*). Debemos ir al fondo, descubrir la intención de la Legislatura y la política pública que hay detrás, del estatuto, y, de ser posible, llegar al resultado que convenga mejor a ellas.

Las diversas facetas del problema de convenios ilegales y los frutos de éstos derivados no siempre encajan dentro de la misma estrecha categoría. Las cortes en los Estados Unidos continentales sabiamente se han negado a aplicar una regla de derecho inflexible y a llegar al mismo resultado mecánico en cada caso. Hechos diferentes y diversas consideraciones de política frecuentemente producen contestaciones diferentes. La Anotación que se encuentra en 120 A.L.R. 1461 indica que "La regla general de que ninguna parte en una transacción ilegal puede instituir procedimiento alguno contra la otra para la devolución de propiedad o de

dinero transferido o pagado en el curso de la transacción, está sujeta a una excepción a favor de personas para cuya protección la ley declaró ilegal la transacción". Por ejemplo, un prestatario no puede alegar que un banco ha sobrepasado el límite estatutario al otorgarle un préstamo (*Gold-Mining Co.* v. *National Bank,* 96 U.S. 640); un director de banco puede ser demandado por el banco en cobro de un préstamo héchole a pesar de que es una ofensa criminal el que un director haga préstamos al banco (*Lester* v. *Howard Bank,* 33 Md. 558); un vendedor de leche que comete un delito por dejar de obtener licencia para vender leche, puede no obstante recobrar del comprador el valor de la leche vendídale (*John E. Rosasco Creameries, Inc.* v. *Cohen,* 11 N.E. (2d) 908 (N.Y., 1937). Al mismo efecto, *Smith* v. *Bach,* 183 Cal. 259; *Washington County* v. *Froehlich Mercantile Co.,* 223 N.W. 575 (Wisc., 1929); *Rosenberg* v. *Hano,* 121 F. (2d) 818, 22 (C.C.A. 3rd, 1941); *First Federal Sav. & Loan Ass'n* v. *Ansell,* 41 N.E. (2d) 420 (Ohio, 1941); *Oregon & Western Colonization Co.* v. *Johnson,* 102 P. (2d) 928, 36; Nota, *Principles Governing Recovery by Parties to Illegal Contracts,* 26 Harv. L. Rev. 738. *The Restatement, Contracts,* Sección 601, dice como sigue:

§601. Resarcimiento Dentro de un Convenio Ilegal Debido al Efecto del Rechazo.

"Si la negativa a poner en vigor o a rescindir un convenio ilegal produciría un efecto perjudicial a las partes para cuya protección existe la ley que declara ilegal el convenio, se permite que se ponga en vigor o se rescinda el contrato, según sea el caso."

Reconocemos que algunas de estas autoridades no se enfrentan directamente con el problema en este caso. Para aliviar los severos resultados provenientes de la aplicación estricta de la regla de "nulo por ilegal", las cortes en dichos casos han hablado en términos de "ilegalidad colateral" y "consideraciones nuevas e independientes"; en otros casos han afirmado que "si un demandante puede probar su caso

sin descansar directamente en la ilegalidad, entonces puede recobrar''. Ninguna de estas fórmulas se aplica directamente a los hechos en este caso, a pesar de que podrían utilizarse para explicar por qué declaramos válida una acusación por abuso de confianza por un dinero cobrado originalmente procedente de una lotería ilegal (*El Pueblo* v. *Medina,* 19 D.P.R. 709), y cómo permitimos que se recobrase dinero depositado por el demandante en manos del demandado aun cuando el dinero representaba los frutos de un contrato ilegal en el cual las partes había participado conjuntamente (*González* v. *Ortiz,* 17 D.P.R. 593). Indicamos de paso que la manifestación en el caso de *Medina* a la pág. 711, que ''es una regla bien establecida que en transacciones con motivo de loterías, como generalmente en todos los contratos ilegales, las cortes dejarán a las partes en la misma situación en que se encuentren y no les prestarán su ayuda para obtener el cumplimiento o la rescisión del contrato'' no es decisiva en este caso, ya que nos confrontamos no con un contrato por ejecutar sino con uno totalmente cumplido por una de las partes.

Nos acercamos un poco más al presente caso, aunque no había envuelto ningún elemento de criminalidad, cuando examinamos el caso de *F. Carrera & Hno.* v. *Aquino,* 60 D.P.R. 143, donde resolvimos que un mayorista que había vendido provisiones en exceso de $300 a un detallista, podía recobrar por ellas, a pesar del hecho que aunque el artículo 82 del Código de Comercio (ed. 1932) disponía que el testimonio oral de testigos no sería por sí solo bastante para probar la existencia de tal contrato, solamente se presentó durante el juicio testimonio oral para probar el mismo. Esta corte posiblemente pudo haber resuelto que la política pública sintetizada en el artículo 82 nos exigía que dejásemos intocada la regla allí establecida. Sin embargo, la manifiesta injusticia de permitir que una parte en un contrato se ampare en el artículo 82 después que la otra ha cumplido totalmente sus obligaciones bajo el contrato, nos persuadió a resolver que

la política pública envuelta no sería frustrada al resolverse que el estatuto no es aplicable a casos en los que el cumplimiento total ha sido realizado por una parte. Así lo resolvimos, aunque en dicho caso no podíamos descansar en dogmas como "ilegalidad colateral" y "establecer un caso sin descansar directamente en la ilegalidad". Para una excelente opinión al mismo efecto, véase *Hummel* v. *Hummel,* 14 N. E. (2d) 923 (Ohio, 1938).

Admitiendo que los obreros en este caso necesitan la ayuda de las transacciones ilegales para sostener su caso, nos confrontamos con el problema suscitado en el presente caso por la reclamación de los obreros de paga ordinaria por el trabajo extra ilegal cuya compensación no han recibido. Como indica Gellhorn en *Contracts and Public Policy,* 35 Col. L. Rev. 679, 82, las Legislaturas, al adoptar estatutos penales, raramente han tenido en mente los problemas en cuanto a la ley de contratos que puedan posteriormente surgir. Su actitud ha sido la de que si declaran que una cosa es un delito, esa cosa desaparecerá en seguida. Cuando, contrario a lo que se espera, tales actividades antisociales no han desaparecido inmediatamente, las cortes, en vista del silencio de la Legislatura, se han confrontado con la necesidad de determinar—y han llegado a conclusiones discrepantes— "en cuanto a si la Legislatura 'tuvo la intención' de que se declarasen nulos los contratos cuando éstos estaban en pugna con las leyes que penalizaban alguna actuación de los contratantes pero que guardaban silencio en cuanto a poner en vigor los convenios".

Reconocemos que los casos de *Lewis* v. *Ferrari,* 90 P. (2d) 384 (Calif. 1939), *Short* v. *Bullion-Beck & Champion Min. Co.,* 57 Pac. 720 (Utah, 1899), *Martínez* v. *Johnson,* 119 P. (2d) 880 (Nev., 1941), *Montgomery Ward & Co.* v. *Luck, et al.,* 52 S. W. (2d) 1110 (Tex., 1932), y *Glendale* v. *Dixon,* 75 P. (2d) 683 (Ariz., 1938), en situaciones como las del presente caso, han negado al obrero el derecho a recobrar por

trabajo extra. Bajo algunos de los estatutos envueltos en dichos casos, el obrero era igualmente culpable del delito; bajo otros no lo era.

No existe una contestación infalible a esta cuestión. Nuestra Legislatura, creyendo aparentemente, como indica Gellhorn, que al declarar delito una actuación se elimina toda posibilidad de que tales actuaciones se cometan en el futuro, guardó silencio sobre la cuestión. Los casos arriba citados denegarían el recobro porque el "Demandante concurrió en un acto ilegal. El demandado cometió un delito y el demandante ayudó y sirvió de cómplice en su comisión . . . El estatuto no podría haber sido infringido en este caso sin la cooperación del demandante. El permitirle que recobre bajo tales circunstancias equivaldría a permitirle que tome ventaja de su propia falta y a estimular un delito que tendió a frustrar una disposición benevolente de la Legislatura" (*Martínez* v. *Johnson,* supra, a la página 882).

El otro punto de vista aparece expresado por la opinión disidente del caso de *Short,* a la pág. 725, así: . "Negarle al demandante el derecho a recobrar el valor razonable del trabajo extra realizado a solicitud del demandado, equivale a castigar a aquél a quien la legislatura tuvo la intención de proteger mediante dicha ley, y recompensar a la parte culpable por una extorsión que se quiso evitar mediante la aprobación de la ley."

Al denegar el pago de compensación, algunos de los casos basan su decisión, en parte por lo menos, en el fundamento de que "demandante y demandado se hallaban en paridad contractual". (*Martínez* v. *Johnson,* supra, pág. 883.) Pero la propia teoría por la que originalmente se sostuvo la validez de la legislación que limita el número de horas reconoce que no existe tal paridad contractual. "La legislatura ha reconocido también el hecho, corroborado en muchos Estados por la experiencia de los legisladores, de que los dueños de estos establecimientos y sus subalternos no están

a un mismo nivel, y que sus intereses son, hasta cierto punto contradictorios. Los primeros naturalmente desean obtener de sus empleados la mayor cantidad de trabajo posible, mientras que a los segundos, el temor de ser despedidos les induce a menudo a aceptar reglamentos que su criterio, ejercido serenamente, condenaría como perjudiciales a su salud y fortaleza. En otras palabras, los patronos imponen las reglas y los obreros están prácticamente obligados a obedecerlas. En tales casos el interés personal resulta frecuentemente un guía peligroso, y la legislatura puede interponer su autoridad.'' (*Holden* v. *Hardy*, 169 U. S. 366, 397). La Corte Suprema de los Estados Unidos recientemente ha reafirmado esta doctrina. ''El punto, al que se ha dado gran énfasis, al efecto de que debe considerarse a los empleados adultos capaces de hacer sus propios contratos, fué terminantemente resuelto hace cerca de cuarenta años en *Holden* v. *Hardy*, supra, donde indicamos la desigualdad entre las condiciones de las partes.'' (*West Coast Hotel Co.* v. *Parrish*, 300 U. S. 379, 93.)

El peticionario hace gran hincapié en el hecho de que la Ley núm. 49 fué declarada constitucional en *M. Taboada* v. *Rivera Martínez,* supra, por el fundamento de que dicha Ley no constituía legislación de clase sino que fué concebida para beneficio de todos los interesados, patronos, empleados, y la comunidad en general. Tomando este hecho como premisa, el peticionario alega que el permitir que se cobre compensación alguna por trabajo efectuado en exceso de nueve horas —no, téngase presente, doble compensación por este tiempo extra, sino aun la compensación corriente—anularía los propósitos de la ley (*a*) de proteger la salud de los obreros y (*b*) de aumentar las probabilidades de empleo, y convertiría el estatuto por legislación judicial, contrario a los deseos de la Legistura, en una ley que simplemente dispone compensación por trabajo extra, privando de ese modo al obrero de su salud y de sus ratos de ocio, y al desempleado de su opor-

tunidad de trabajar. El peticionario por tanto sostiene que la política pública nos obliga, para llevar a cabo los propósitos de la Ley núm. 49, a sostener que el obrero no deberá percibir compensación por su trabajo extra.

Es costumbre corriente referirse a leyes como la núm. 49 como concebidas para beneficio de la comunidad en general. Pero esto no significa que las cortes no deban dar consideración primordial a los derechos de los obreros. Lo que tales palabras significan es que cuando a los obreros, que constituyen una parte importante de la comunidad, se les paga decentemente y se les mantiene en salud, a la vez que se les aseguran las mayores oportunidades de empleo, los resultados de esa clase de legislación paternal, aunque específicamente dirigidos a beneficiar algunos trabajadores en particular, redundan en beneficio de la comunidad en general.

Debe confesarse que el permitir que los obreros recobren en el presente caso no fomentaría por sí mismo la reconocida política pública de la Ley núm. 49 a los efectos de lograr trabajadores saludables y mayor distribución de empleos. Pero las cortes han de considerar los hechos tal y como los encuentran. Y en este caso todas las partes nos han informado que hay pendientes miles de casos similares al presente. Por lo tanto no estamos en la misma posición que las cortes que han manifestado que "Es mucho más importante para la clase trabajadora, desde el punto de vista de la salud y la distribución del trabajo, el conservar la ley de las ocho horas, que el que a un infractor *ocasional* de la misma se le permita recobrar por el tiempo que invirtió en violarla. El que trabaja más de ocho horas diarias cuando no existe emergencia no solamente está frustrando la ley en cuanto a la salud se refiere, sino que priva a otra persona de la oportunidad de trabajar durante esas horas extras y de ganarse el sustento para sí y para su familia." (*Glendale* v. *Dixon,* supra, a la pág. 694; bastardillas nuestras.) No podemos pasar por alto la situación de hechos con que

se nos confronta. Tan pronto nos dice el patrono que el permitir en el presente caso que se recobre sería conceder una reparación que envuelve millones de dólares en miles de casos contra negocios pequeños, medianos y grandes, arruinando de ese modo la economía de Puerto Rico, como, a renglón seguido, pretende que establezcamos una política pública basada en violaciones *ocasionales* del estatuto.

Gellhorn, a la página 688 del artículo anteriormente citado, censura adversamente la doctrina establecida en el de *Short* y casos similares. Sin embargo, aceptamos que todos los casos que han sido traídos a nuestra atención concurren con el de *Short*, excepción hecha de *Turney* v. *J. M. Tillman Co.,* 228 P. 933 (Ore., 1924), otro caso procedente de Oregón que está de acuerdo con el de *Turney* (*Pederson* v. *City of Portland,* 24 P. (2d) 1031 (Ore., 1933)), y, sobre esta cuestión en particular, el de *Thibault* v. *National Tea Co.,* 260 N. W. 466 (Minn., 1936). Sin embargo, aunque por razones que ya hemos señalado no podemos seguir el caso de *Turney* en su decisión al efecto de que los obreros tienen derecho a recobrar doble compensación por trabajo efectuado en exceso de la novena hora, estamos de acuerdo, en lo que se refiere a la reclamación de compensación ordinaria por tal trabajo, en que "Sería despojar al estatuto de su significado y burlar su fin el dar a la ley una interpretación tal que impidiese al obrero cobrar por el trabajo efectuado en exceso de ocho horas diarias, aun cuando el patrono pueda violar la ley al exigir tal trabajo. Corrientemente no debe permitirse a la parte culpable tomar ventaja de su propia falta para eludir responsabilidad." (*Turney* v. *J. H. Tillman Co.,* supra, a la pág. 935.)

Deseamos dar énfasis al hecho de que no estamos en desacuerdo con la decisión de los casos anteriormente citados al efecto de que un contrato para llevar a cabo tal trabajo extra está en contra de la política pública y su cumplimiento no puede obtenerse a través de las cortes. Diferimos de ellos

cuando de igual modo resuelven que aun después de haber el obrero cumplido con el contrato en su totalidad, tal política pública requiere asimismo, a pesar de guardar silencio la Legislatura sobre ese punto, que el fruto de su trabajo quede en manos del patrono, en vez de ser restituído al obrero para cuyo beneficio se aprobó en primer lugar la ley.

No hemos hallado en esta jurisdicción ningún caso directamente aplicable. El que más se asemeja es el de *Montaner* v. *Comisión Industrial*, 54 D.P.R. 67. En dicho caso resolvimos que un menor estaba protegido por la Ley de Compensaciones por Accidentes del Trabajo, a pesar del hecho de que el patrono cometió un delito al emplearlo sin haber obtenido un permiso. En el caso de *Montaner* esta corte se confrontaba con la política pública en contra del trabajo de menores, que es por lo menos tan fuerte como la política pública en favor de una jornada máxima para trabajadores adultos. Por tanto, el presente caso aparentemente es un caso *a fortiori* de acuerdo con el de *Montaner*, especialmente si recordamos (*a*) que en cuanto a compensaciones a obreros, el menor era a lo sumo un tercero beneficiario (*third party beneficiary*) en el contrato existente entre el patrono y el Fondo del Estado, (*b*) que aun si se hubiese negado compensación por accidentes del trabajo, el menor probablemente hubiera tenido derecho a una acción ordinaria contra el patrono, y (*c*) que no existió enriquecimiento injusto, en el sentido de que el menor se había ganado el derecho a tal compensación por accidentes del trabajo, si se compara a los obreros del presente caso, que han trabajado horas extras sin recibir compensación alguna. Cf. *Oklahoma Portland Cement Co.* v. *Pollock*, 73 P. (2d) 427 (Okla., 1937).

El patrono podría, quizá, alegar que el caso de *Montaner* puede ser distinguido de acuerdo con los casos anteriormente considerados, en cuanto a que la cuestión de compensaciones a obreros era colateral a la del contrato ilegal de empleo, y que por tanto dicho caso no resolvió que un me-

nor que trabajaba en tales circunstancias ilegales podría más tarde reclamar su salario. Pero esta Corte declaró específicamente en el caso de *Montaner,* llámese *dictum* o no, que (pág. 69) "Tanto el castigo (véase artículo 19) como la limitación van dirigidos al patrono. El contrato de trabajo puede ser exigido por el menor en lo que al sueldo devengado se refiere."

En el caso de *Traders & General Ins. Co.* v. *Rogers,* 119 S. W. (2d) 679 (Tex., 1938), se resolvió que un empleado que trabajaba en un restaurante sin haber obtenido el certificado médico que la ley exigía no podía reclamar compensación por accidentes del trabajo. Al así decidir la corte se basó en *Montgomery Ward & Co.* v. *Lusk,* supra, y en *Short* v. *Bullion-Bech & Champion Min. Co.,* supra. Habiéndonos negado en el caso de *Montaner* a seguir la doctrina establecida en el de *Rogers,* somos consistentes al repudiar el de *Short* y otros casos en que el de *Rogers* se basa.

No nos es posible distinguir en la cuestión que se nos plantea entre la política pública que comprende el prohibir el trabajo de menores y la que comprende el prohibir el trabajo excesivo de obreros adultos. Ambos grupos están bajo el brazo protector del gobierno. Si uno de ellos puede reclamar compensación por tal trabajo efectuado ilegalmente, debe concederse al otro el mismo derecho. Williston es de la misma opinión como una proposición general. "Si un demandante, aunque delincuente, no ha sido culpable de depravación moral, y la pérdida que ha de sufrir al negársele reparación está completamente fuera de proporción con lo que requiere bien la política pública o un castigo individual apropiado, podrá permitírsele que recupere la compensación que ha dejado de percibir." (6 Willinston *on Contracts,* Rev. ed., §1789.) *The Restatement, Contracts,* §604, es aun más claro. "*Resarcimiento por una Parte que no está in Pari Delicto.* Cuando las partes en un convenio ilegal, aunque ambas culpables, no están *in pari delicto,* y una de ellas no

ha sido culpable de grave depravación moral, ésta puede repudiar el convenio, y si ha rendido alguna labor de acuerdo con el mismo, puede recobrar la misma o su valor.''

Aunque la analogía no es perfecta, notamos que esta corte ha intercalado en el derecho civil la doctrina de fideicomisos constructivos (*constructive trusts*) con el fin de evitar el enriquecimiento injusto. *Flor Ruiz* v. *Ruiz*, 61 D.P.R. 823, resuelto en 28 de abril de 1943. Véase 51 Harv. L. Rev. 929, 30. Lo mismo debemos hacer en beneficio de los obreros que han trabajado sin recibir compensación. No tenemos que aceptar la invitación de los patronos de hacer una amplia investigación en el campo de la semántica para afirmar que existe el enriquecimiento injusto de parte de un patrono si sus empleados trabajan sin percibir compensación.

Finalmente, existe una respuesta concluyente a la contención de que no debe permitirse al obrero que perciba compensación al tipo corriente por trabajo efectuado después de la novena hora. El obrero se gana tal compensación. Impedirle recobrarla sería imponerle una penalidad. Hemos visto que las penalidades deben ser expresas, y no pueden ser inferidas. Considerando que constituye esencialmnte una penalidad, nos hemos negado, en vista del silencio de la Legislatura sobre este punto, a permitir que los obreros cobren doble salario por trabajo efectuado en exceso de nueve horas. Por la misma razón, toda vez que la Legislatura no ha prohibido específicamente que el obrero recobre el pago corriente que ha ganado por tal trabajo, no podemos por inferencia intercalar tal disposición en la Ley núm. 49.

Además de las anteriores consideraciones que nos han llevado a la conclusión de que una interpretación razonable de la Ley núm. 49 y de la política pública en ella comprendida nos obliga a resolver que el obrero tiene derecho a percibir compensación al tipo corriente por las horas extras que ha trabajado en exceso de la novena hora, creemos que es

aplicable a esta situación el artículo 1257 de nuestro Código Civil. Dicho artículo, refiriéndose a la nulidad de los contratos, dice como sigue:

"Cuando la nulidad provenga de ser ilícita la causa u objeto del contrato, si el hecho constituye un delito o falta común a ambos contratantes, carecerán de toda acción entre sí, y se procederá contra ellos, dándose además a las cosas o precio que hubiesen sido materia del contrato, la aplicación prevenida en el código penal respecto a los efectos o instrumentos del delito o falta.

"Esta disposición es aplicable al caso en que sólo hubiere delito o falta de parte de uno de los contratantes; pero el no culpado podrá reclamar lo que hubiese dado, y no estará obligado a cumplir lo que hubiera prometido."

Descansando en varios casos resueltos por este tribunal, seguidamente el peticionario sostiene que las querellas en el presente caso no aducen hechos suficientes para establecer una causa de acción. En *García* v. *Cañada,* 11 D.P.R. 421, se resolvió que de acuerdo con nuestro Código Civil una demanda por prestación de servicios domésticos en la que no se alegó la existencia de un convenio para el pago del salario, o de alguna costumbre o uso frecuente a ese efecto, era defectuosa. Consignando, a la página 425, que "Ha sido muy corriente en Puerto Rico, entre sirvientes, emplearse con una persona confiando en un convenio para adquirir casa y comida", esta corte resolvió que "En vista del estado de la ley no podemos suponer que existiera una costumbre o práctica para abonar salarios *por esta clase de arrendamiento de servicios"* (Bastardillas nuestras). Resulta interesante ver cómo en el curso de la opinión, después que esta corte indicó en la página 424 que "En casi todos los Estados de la Unión donde prevaleció el derecho común, si una persona realizaba un trabajo u obra para otra la ley implícitamente suponía que existía un contrato de parte del principal para pagar un jornal o salario razonable", a la página 425 dijo que "los principios que prevalecen, según nuestro Código Civil, y en los Estados, no presentan gran diferencia".

No puede, sin embargo, pasarse por alto el hecho de que en un caso posterior, *Agosto* v. *Woods,* 13 D.P.R. 369, citando como precedente el de *García* v. *Cañada,* esta corte claramente resolvió sin limitación alguna que en un pleito para el pago de servicios prestados la demanda es defectuosa si no alega (pág. 374) "que exista un precio cierto pactado" o que "el precio de los servicios es conocido por la costumbre y uso frecuente en el lugar en que tales servicios se prestaron." Al mismo efecto, véase *Ledesma* v. *Araújo,* 15 D.P.R. 249, 254.

Sin embargo, en el caso más reciente sobre esta cuestión, basado en hechos casi idénticos a los del de *Agosto* v. *Woods,* esta corte no resolvió categóricamente que en ausencia de un precio pactado o un tipo acostumbrado, no podía reclamarse por servicios prestados. Dijimos en *Ex parte Capó,* 59 D.P.R. 899, a la página 903 que "Aun aceptando, *sin así resolverlo,* que el reclamante tuviese derecho a reclamar el justo y razonable valor de sus servicios, siempre nos veríamos obligados a confirmar la sentencia recurrida por no haberse presentado evidencia alguna en cuanto a ese extremo." (Bastardillas nuestras.)

No es necesario en el presente caso que reexaminemos la regla establecida en los casos que acabamos de discutir. Todos ellos, excepto *Ex parte Capó,* fueron resueltos en los primeros años del 1900, mucho antes de la aprobación de la Ley núm. 49 de 1935. Este último estatuto fué aprobado a la luz de condiciones más modernas. Es obvio que posee un designio y propósito diferentes a las disposiciones anteriores del Código. En muchas ocasiones sus términos echan a un lado hasta los convenios específicos. Si también suministra condiciones específicas para un contrato por servicios en el que tales condiciones faltan, es una cuestión que aquí no tenemos que tomar en consideración. Es suficiente a nuestros fines que llamemos la atención al hecho de que los casos citados no son decisivos en cuanto al presente, porque

aquí se alega que existía un contrato específico para trabajar a razón de $1.68 por día. Interpretamos esto en el sentido de que los obreros alegan que su contrato como cuestión de hecho era por ocho horas a $1.68. Asimismo alegan ellos que trabajaron cuatro horas extras cada día y solicitan doble compensación por las mismas amparándose en las disposiciones de la Ley núm. 49. Aunque hemos resuelto que la Ley núm. 49 no dispone específicamente que el tiempo trabajado en exceso de nueve horas debe ser compensado a razón del doble de la compensación corriente, surge una situación completamente distinta en relación con la reclamación de que se les pague por dichas horas extras a razón del tipo corriente de compensación. Sin determinar en detalle hasta qué punto, si alguno, la regla establecida en *Agosto* v. *Woods,* ha sido modificada por la Ley núm. 49 y otras leyes, estamos satisfechos en que, aun bajo la regla original, la alegación de la existencia de un contrato o de una compensación acostumbrada a un tipo específico de pago, es suficiente alegación para hacer factible que se reclame a razón de ese mismo tipo el pago del tiempo trabajado en exceso del término fijado en el contrato o por la costumbre. Y si se levanta la cuestión de perfección en las alegaciones, deberá recordarse que estos casos se originaron en la Corte Municipal a virtud de querellas suscritas por los obreros solamente, y que la sección 6 de la Ley núm. 10, Leyes de Puerto Rico, 1917 (II, pág. 217), impone a las cortes el deber de no tomar en consideración defectos de forma en pleitos que en reclamación de salarios se traigan de acuerdo con ella.

La última contención del peticionario es que existe la presunción de que las leyes se cumplen, y en ausencia de alguna alegación en contrario en la querella, debemos presumir que el demandado, al pagar $1.68 por día, ha pagado ya no sólo el tipo de compensación corriente, si que aun a razón del doble de tal compensación, por todas las horas trabajadas en exceso de ocho durante cualquier día. En *War-*

*ren-Bradshaw Co.* v. *Hall*, 317 U. S. 88, hallamos a la pág. 93, una contestación categórica a esta contención, en relación con la *Fair Labor Standards Act:*

"La contención final merece escasa consideración. Los demandados fueron empleados a base de un día de ocho horas y regularmente trabajaron siete días a la semana, recibiendo jornales fijos que fluctúan entre $6.50 y $11 al día. No existía convenio alguno que especificase la cantidad a pagarse por hora o que el salario semanal incluía compensación adicional por horas extras. El peticionario arguye que cumplió con las disposiciones de la ley en cuanto a compensación por trabajo extra, ya que los demandados percibieron salarios más altos que el salario mínimo fijado por Ley, incluyendo tiempo y medio a razón de ese salario mínimo por todas las horas extras, salarios que los demandados al aceptarlos, implícitamente convinieron incluían compensación por tiempo extra. Una contención similar fué directamente rechazada en *Overnight Motor Co.* v. *Missel*, 316 U. S. 572."

En el caso de *Overnight Motor Co.*, se consideró este problema en la forma siguiente, a la pág. 581:

"El peticionario invoca la presunción de que las partes contratantes intentan cumplir con la ley y alega que por tanto no existe justificación para interpretar el contrato en el sentido de pagar al obrero solamente el salario básico o 'tipo corriente', sin tomar en consideración el número de horas trabajadas. Es cierto que el jornal pagado era suficientemente alto para cubrir tanto el salario básico como un cincuenta por ciento adicional por las horas realmente trabajadas en exceso del máximo fijado por ley, sin constituir una violación de la sección seis. Pero no existía límite alguno en el contrato en relación con las horas que el peticionario, si hubiese deseado hacerlo, pudo haber exigido que el demandado trabajase a razón del salario convenido, así como tampoco existía disposición alguna de pago adicional en caso de que las horas trabajadas hubiesen de ser pagadas a razón de un tipo mínimo mayor que el salario estipulado. La inferencia no puede remendar un contrato tan deficiente en el cumplimiento de la ley. Este contrato se distingue del existente en el caso de *Walling* v. *Belo Corp.*, *post*, pág. 624, en el cual el contrato especificaba un tipo de compensación por hora y no menos de tiempo y medio por trabajo extra, incluyendo la garantía de una

cantidad semanal fija, y exigía al patrono pagar más que la garantía semanal en aquellos casos en que las horas trabajadas a razón del tipo fijado en el contrato excediesen de tal cantidad.''

Cuando el caso de *Overnight Motor Co.* es considerado conjuntamente con el de *Walling* v. *Belo Corp.*, 316 U. S. 624, puede verse claramente que el verdadero tipo mínimo por hora a pagarse es una cuestión de hecho que depende del convenio entre las partes o la costumbre que impere. Como la Corte señala en el caso de *Belo Corp.* (págs. 631–2) ''En su etapa inicial la cuestión a que esta discusión da origen es una de derecho, la de interpretación del término estatutario 'tipo corriente'. Pero se concede que como cuestión de derecho, patronos y obreros pueden fijar el 'tipo corriente' mediante contrato. . . . Resta decidir si los $40 [la compensación semanal convenida en dicho caso; $1.68, la compensación diaria convenida en el nuestro] comprenden compensación por tiempo extra así como por salario básico.'' (Materia en corchetes nuestra.)

*Wilson* v. *New*, 243 U. S. 332, y *Nelson* v. *St. Joseph & G. I. Ry., Co.*, 205 S. W. 870 (Mo., 1918), surgieron bajo la *Ley Adamson* y no son aplicables al presente caso. Esa Ley Federal fué más allá que la núm. 49, que sencillamente dispuso que ocho horas constituirán el día normal de trabajo. La sección 1 de la Ley Adamson disponía no sólo que ''se considerará ocho horas, en contratos que comprenden trabajos o servicios, como el trabajo de un día'', si que continuó disponiendo que ocho horas será ''la medida o norma de un día de trabajo a los efectos de computar la compensación por los servicios de todos los obreros . . . ''. En ausencia de una disposición similar a la cláusula anterior, la Ley núm. 49 se rige por el principio establecido en los casos de *Overnight Motor Co.* y *Belo Corp.*

De acuerdo con el *Fair Labor Standards Act* el tipo acostumbrado o el fijado en el contrato no podrá ser menor que el tipo mínimo allí establecido. Pero, como ya hemos indi-

cado, la Ley núm. 49 no dispuso tipo mínimo alguno, y, excepto en cuanto a convenios colectivos, nada existe a modo de ley insular a la que se haya llamado nuestra atención, que impida que las partes lleven a cabo un contrato a base de salarios de hambre. Nosotros, por supuesto, ni por inferencia ni de otro modo, reformaremos el contrato existente entre las partes para hacer que el $1.68 cubra las doce horas. Pero si la prueba que se presente en el juicio demuestra que tal fué en realidad la intención o convenio entre las partes, o que existía una costumbre prevaleciente a ese efecto, los obreros han obtenido una victoria ilusoria con nuestra decisión al efecto de que tienen derecho a compensación por las décima, undécima y duodécima horas, a razón del tipo corriente. Es decir, si las partes en realidad convinieron en que el obrero recibiría $1.68 por doce horas, resultando que el tipo por hora es 14 centavos, el obrero ya ha sido totalmente compensado al tipo ordinario por todas las doce horas, aunque él tendrá, desde luego, derecho a la compensación extra por la novena hora que el estatuto específicamente dispone deberá recibir. Convenios colectivos, los records de compensaciones a obreros, convenios individuales escritos u orales, los records de la Administración de Ajuste Agrícola, pagos hechos cuando sólo se trabajó parte del día debido a enfermedad, y la costumbre de la comunidad o de la industria, son fuentes ilustrativas de los hechos que las cortes inferiores tendrán que determinar al considerar esta cuestión.

En verdad, aun si estuviéramos de acuerdo enteramente con los obreros y resolviéramos que la Ley núm. 49 específicamente dispone doble compensación por todas las horas trabajadas en exceso de ocho horas durante cualquier día, tal resolución podría ser una esperanza ilusoria. La Ley núm. 49 no es un estatuto de salario mínimo, y no podemos retorcerla hasta convertirla en una de esa naturaleza. Cualesquiera derechos bajo la misma podrían por tanto ser con-

vertidos en ilusorios sin un tipo de salario mínimo, adquirido por legislación o por convenio colectivo. Esto se debe a que, como ya se ha indicado, nada haya en la Ley núm. 49 que impida a un patrono establecer un salario bajo, el cual se duplica por horas extras. Una vez más repetimos que no debe esto interpretarse como que significa que estamos resolviendo que cada patrono puede ahora reconstruir artificialmente con carácter retroactivo los convenios bajo los cuales sus obreros trabajaron, con el fin de afirmar ahora que si una cantidad específica por hora se toma como el tipo recibido, el obrero ya ha sido totalmente compensado, aun por la novena hora a doble tipo y por horas en exceso de las nueve horas bien al tipo ordinario o al doble de dicho tipo. La intención de las partes se descubre determinando cuáles fueron los convenios verdaderos, al tiempo en que se realizó el trabajo, tal como surgen de todas las circunstancias. A este efecto, véase *Thibault* v. *National Tea Co.*, supra.

Nos damos cuenta de las dificultades que pueden surgir en un esfuerzo para determinar si la compensación pagada originalmente cubría todas las horas extras trabajadas. Sólo podemos repetir que la situación en este caso no ha sido creada por nosotros y que el remedio para ella no cae dentro de nuestra incumbencia.

En vista de nuestra resolución de que los obreros tienen derecho de acuerdo con la Ley núm. 49 a doble compensación por la novena hora de trabajo durante cualquier día natural y a compensación ordinaria por trabajo realizado en exceso de nueve horas, *el auto inhibitorio será anulado y se devolverá el caso a la corte de su origen para ulteriores procedimientos no inconsistentes con esta opinión.*