HOSPITAL SAN JOSÉ, INCORPORADO, representado por su Presidente, DR. ESTEBAN GARCÍA CABRERA, recurrente, *v.* JUNTA DE SALARIO MÍNIMO DE PUERTO RICO, demandada.

Núm. 86 (84–101).—*Sometido:* Mayo 17, 1944. *Resuelto:* Junio 2, 1944.

*Manuel García Cabrera, Clemente Ruiz Nazario* y *Arturo Ortiz Toro,* abogados de los recurrentes; *Hon. Procurador General Interino M. Rodríguez Ramos, Gabriel Guerra Mondragón* e *Ismael Soldevila,* abogados de la demandada.

EL JUEZ ASOCIADO SEÑOR TODD, JR., emitió la opinión del tribunal.

Por estipulación de las partes, aprobada por la corte, estos dieciocho recursos de revisión fueron consolidados y las cuestiones legales planteadas fueron discutidas y sometidas en una sola vista y a virtud de un solo alegato escrito. En verdad envuelven una sola cuestión fundamental, a saber,

si la Junta de Salario Mínimo, creada por la Ley núm. 8 de 1941 ((1) pág. 303), tiene autoridad o opoder para fijar el salario mínimo que las clínicas y hospitales de Puerto Rico, como patronos, han de pagar a sus empleados no técnicos, según lo hizo a virtud del Decreto Mandatorio núm. 4 aprobado el 18 de mayo de 1943 y enmendado el 15 de noviembre de 1943.

██ Antes de entrar a considerar y resolver esta cuestión es conveniente decir que sólo tenemos ante nos las instituciones recurrentes mencionadas en el título y, por tanto, no podemos tomar en consideración la contención de los recurrentes al efecto de que la Junta de Salario Mínimo carece de poder para fijarle un salario mínimo a los empleados de hospitales del gobierno insular o municipal, cuyos sueldos son fijados por la Legislatura o por la Asamblea Municipal. Todas las recurrentes son entidades privadas y carecen de personalidad para impugnar dicho poder. ¿Puede sostenerse que la Ley núm. 8 de 1941 no sea aplicable a los hospitales y clínicas privados como pretenden los recurrentes? Veamos sus términos y propósitos.

Comenzaremos por las definiciones que de las palabras patrono, ocupación, negocio, obrero, empleado y trabajador contiene la sección 30 de la ley, para luego relacionarlas con otras de sus secciones, y así poder determinar cuál fué la intención legislativa en cuanto al alcance de los poderes concedidos a la Junta de Salario Mínimo. Dispone la sección 30, en lo pertinente, que "En esta Ley, a menos que del contexto de ella se deduzca otra cosa, se aceptarán las siguientes definiciones de palabras y frases de la misma:

" 'Patrono' incluye toda persona natural o jurídica dedicada a actividades industriales, comerciales, *de negocios*, agrícolas o de servicio público que emplea a obreros, *empleados o trabajadores mediante paga, jornal, salario o cualquier otra manera de compensación.*

" *       *       *       *       *       *       *

" 'Ocupación' incluye toda obra o trabajo en factorías, molinos. centrales, talleres, *establecimientos*, fábricas, fincas, haciendas, estan-

cias, empresas de transporte y comunicación y *sitios de cualquier clase donde se realice labor o negocios lucrativos.*

" 'Negocio' incluye toda obra o trabajo en almacenes, tiendas, *establecimientos o sitios de cualquier clase* donde se realicen transacciones mercantiles o *se presten servicios mediante remuneración.*

" *      *      *      *      *      *      *

" 'Obrero', 'Empleado', 'Trabajador' incluyen a *todo* trabajador manual, artesano, jornalero, dependiente de comercio y *a toda persona empleada mediante remuneración en cualquier ocupación, negocio* o industria.

"Los términos incluídos en esta sección no excluirán ningún otro término comprensivo de actividades agrícolas, industriales o comerciales. Las disposiciones de esta Ley no se aplicarán a personas empleadas en el servicio doméstico." (Bastardillas nuestras.)

La Declaración de Principios que contiene la ley, y la cual copiamos al margen,([1]) indica que la política pública fundamental que tuvo en mente el legislador fué la de mejorar las condiciones de trabajo perjudiciales a la conservación de las

---

([1])"Sección 1.—(a) Por la presente la Asamblea Legislativa de Puerto Rico declara que la existencia de condiciones de trabajo perjudiciales a la conservación de las normas mínimas de vida necesarias para la salud, la eficiencia y el bienestar general de los trabajadores en las distintas *ocupaciones* (1) hace que el comercio, la agricultura y la industria sirvan para propagar y perpetuar dichas condiciones de trabajo; (2) constituye un método de competencia desleal·en la producción y el intercambio; (3) conlleva el pago de salarios insuficientes para satisfacer las necesidades mínimas de los trabajadores; (4) motiva conflictos entre obreros y patronos que entorpecen el progresivo desarrollo de la economía puertorriqueña; y (5) *representa un estado de manifiesta injusticia social.*

"(b) Se declara por la presente que la política de esta Ley es, mediante el ejercicio de la facultad de la Asamblea Legislativa de Puerto Rico para decretar leyes para la protección de la vida, salud y seguridad de empleados y obreros, corregir y tan rápidamente como sea posible eliminar las condiciones mencionadas anteriormente existentes en las distintas *ocupaciones,* sin reducir los empleos sustancialmente o la facultad para ganar la vida.

"(c) Se declara que es la política pública de esta Ley proteger a los trabajadores en sus medios de vida en tal forma que el propósito de hacerlo, al llevarse a la práctica, no destruya las fuentes mismas de empleo y trabajo. Es la política pública de esta Ley que el nivel de vida de los trabajadores se levante a una proporción justiciera con el nivel económico de prosperidad de las ramas de producción que los emplean, según este nivel se mantenga y crezca por obra del mayor poder adquisitivo dado por esta Ley misma, por otra legislación, o por las condiciones económicas generales que tales resultados produjeren.

"(d) Se declara, *además,* que es la política de esta Ley asegurar el progresivo desenvolvimiento de la agricultura y de las industrias y *negocios* que

normas mínimas necesarias para·la salud, la eficiencia y bienestar general de los trabajadores en las distintas *ocupaciones,* según se definen éstas en la sección 30, supra. Otras secciones de la ley(²) robustecen la conclusión a que llegamos de que la política pública expuesta en la Declaración de Principios, no está circunscrita, como sostienen los recurrentes, a que la Junta determine exclusivamente, los salarios mínimos en relación con los trabajadores que realicen trabajos de índole agrícola, comercial o industrial y que° debemos aplicar la doctrina de *"ejusdem generis"* al interpretar las demás frases contenidas en la ley en relación con las palabras "agricultura, comercio o industria". Con cita de autoridades recientemente resolvimos en el caso de *Pueblo* v. *Del Valle,* 60 D.P.R. 184 que, tanto la doctrina de *"ejusdem generis"* como la máxima *"noscitur a sociis",* son reglas de interpretación que no deben aplicarse si al hacerlo se desvirtúa la intención legislativa y en cuanto a la primera, dijimos: "No es una doctrina rígida e inflexible que pueda y deba aplicarse como regla interpretativa cuando dicha

---

operan en Puerto Rico, procurando garantizarles condiciones favorables a su estabilidad económica y a su natural expansión, y que a tal efecto el organismo creado para dar cumplimiento a los propósito de esta Ley fijará salarios tomando en consideración los costes, la situación financiera de las industrias y ramas de la producción, las fluctuaciones del mercado, y las condiciones especiales existentes en cada localidad, así como las condiciones de vida y de trabajo de los obreros." (Bastardillas nuestras.)

(²) Véase la sección 3, que impone a la Junta "el deber de estudiar los salarios, horas de labor y condiciones de trabajo que prevalecen en las distintas *ocupaciones, negocios* e industrias de Puerto Rico, y hacer investigaciones en cuanto a la *salud, seguridad y bienestar de los trabajadores;"* (bastardillas nuestras); la Sección 4 que concede amplios poderes a la Junta o a cualquiera de sus miembros para realizar investigaciones y citar testigos; la sección 5 que impone el deber a toda persona, firma, sociedad o corporación "que emplee trabajadores en Puerto Rico" (sin distinción y debiendo aceptarse la definición de trabajadores que da la sección 30, supra) de suministrar a la Junta "Todos los informes, datos y estadísticas que la Junta solicite para llevar a cabo los propósitos de esta Ley", y de "permitir a cualquier miembro de la Junta, empleado, investigador o agente de la misma debidamente autorizado, libre acceso a los *edificios,* fábricas, molinos, talleres, maquinarias, granjas, plantaciones, fincas y *otros establecimientos y sitios en donde se efectúe cualquier* clase de trabajo, con el propósito de obtener cualquier información . . . o para hacer cualquier

interpretación tendría como consecuencia hacer ineficaz dicha intención o propósito legislativo'' (pág. 187).

Los deberes impuestos a la Junta y a los comités de Salario Mínimo nombrados y los poderes que se les conceden por la ley, están inspirados primordialmente en el deseo de nuestra legislatura de mejorar la salud, seguridad y bienestar de los trabajadores, después que dichos organismos hayan investigado los salarios, horas de labor y condiciones de trabajo prevalecientes en las distintas ocupaciones, negocios e industrias de Puerto Rico. Las únicas personas excluídas de las disposiciones de la ley son los empleados en el servicio doméstico. Cualquier defecto u omisión en la definición de las distintas palabras o frases incluídas en la sección 30, supra, no debe ser motivo para que interpretemos el alcance de la ley en tal forma que desvirtuemos el propósito fundamental de la misma. Como dijo el Juez Frankfurter a nombre de la Corte Suprema Nacional en el caso de *Phelps Dodge Corp.* v. *Labor Board*, 313 U. S. 177, 185, al interpretar el alcance del ''National Labor Relation Act'': ''Desemejante a los símbolos matemáticos, la fraseología de

investigación de la condiciones de trabajo que allí prevalecen o cualquier inspección de libros, informes, contratos, nóminas, documentos o constancias relacionados con el empleo de trabajadores'' e impone sanción penal a todo ''patrono, administrador, agente o encargado de cualquier establecimiento agrícola, comercial o industrial o de *cualquier otro sitio* en donde *se efectúa cualquier clase de trabajo*'', que se negare a comparecer, sin causa justificada, ante la Junta para prestar testimonio, o que rehusare permitir la entrada a cualquiera de las personas antes mencionadas a los establecimientos descritos o se negaren a suministrar los informes solicitados o impedir el examen de sus libros, nóminas, etc.; la sección 6 dispone que la Junta tendrá el deber de nombrar un Comité de Salario Mínimo para investigar las condiciones de trabajo que prevalecen en las ocupaciones, negocios o industrias, en las cuales los salarios que se pagan son insuficientes para satisfacer las necesidades normales de los trabajadores y perjudiciales a la conservación de las normas mínimas de vida necesarios para la salud, la eficiencia y el bienestar de los mismos,'' debiendo nombrarse para dicho comité dos representantes de los patronos, dos representantes de los trabajadores de dicha ocupación, negocio o industria y un quinto nombrado en representación de los intereses públicos; y luego establece que el comité debe informar a la Junta sus conclusiones y lo que incluirán. (En cuanto al alcance de las facultades concedidas a los comités nombrados por la Junta, véase *Luce & Co.* v. *Junta de Salario Mínimo*, 62 D.P.R. 452.)

legislación social como ésta rara vez logra más que precisión aproximada en sus definiciones. Es por esto que todas las ayudas relevantes son consideradas para determinar su significado. De consideración dominante es el hecho de que las palabras adquieren alcance y funcionan debido a la historia de acontecimientos que ellas resumen''. En la ley federal la única definición de la palabra *''employee''*, en forma afirmativa es al efecto de que dicho término ''incluirá cualquier empleado'' y luego en forma negativa excluye a los empleados agrícolas, del servicio doméstico o a cualquier persona empleada por su padre o esposo. Interpretando el alcance de la palabra ''empleado'' la Corte Suprema Nacional en el caso de *National Labor Relation Board* v. *Hearst Publications*, decidido hace poco más de un mes, el 24 de abril de 1944 (—— U. S.——), resolvió que ''el amplio lenguaje usado en las definiciones contenidas en la Ley, que por sus términos rechazan las limitaciones convencionales de tales conceptos como ''empleado'', ''patrono'' y ''disputa obrera'', no dejan lugar a dudas que su aplicabilidad debe ser determinada ampliamente, *en situaciones dudosas,* por los hechos económicos fundamentales más bien que técnica y exclusivamente por clasificaciones legales establecidas anteriormente'' . . . ''Dicho término (empleado) como otros similares, deben entenderse haciendo referencia al propósito de la ley y a los hechos envueltos en la relación económica.''

Nuestra ley también es susceptible de esta interpretación amplia y comprensiva. Al definir las palabras ''obrero'', ''empleado'' y ''trabajador'' se dice que ''incluyen todo trabajador manual, artesano, jornalero, dependiente de comercio y *a toda persona empleada mediante remuneración en cualquier ocupación, negocio* o industria''. Los únicos excluídos son los empleados en el servicio doméstico.

La precaria situación económica prevaleciente de nuestras clases trabajadoras en general debido a los salarios inadecuados que han venido percibiendo durante largos años,

indujo sin lugar a dudas a nuestra Legislatura a aprobar la ley creando la junta que habría de fijar los salarios mínimos necesarios para garantizar, hasta donde sea humanamente posible, una mejor vida, salud y seguridad a dicha clase trabajadora.

■ Arguyen, sin embargo, los hospitales y clínicas recurrentes, que ellos no constituyen "negocios" dentro del significado que a dicha palabra da la propia ley. Una mera lectura de la definición antes transcrita demuestra que no tienen razón, pues expresamente dice que la palabra "negocio" incluye ". . . establecimientos o sitios de cualquier clase donde . . . se presten servicios mediante remuneración." Arguyen, además, que algunas de las recurrentes son instituciones caritativas organizadas con fines no pecuniarios (Hospital Presbyteriano, Auxilio Mutuo, Hospital San Lucas) y que las demás también han sufrido pérdidas y no podrían subsistir de verse obligadas a pagar los salarios fijados por la Junta y que ninguna de ellas puede considerarse como una industria.

Los dos casos citados por las recurrentes para sostener que ellas no constituyen una "industria" (y son los únicos casos citados en su alegato) son los de *Yocum* v. *Feld,* 176 So. 753, y *Western Pennsylvania Hospital* v. *Lichliter* (Pa. 1941) 17 A. (2d) 206. En el de *Yocum* se resolvió que "El ejercer la medicina o . . . ejercer la profesión de médico, no constituye llevar a cabo un comercio (*conducting a trade*) o una industria y por tanto una ordenanza regulando el comercio y las industrias no es aplicable a uno que ejerce la profesión de médico". Y en el de *Lichliter* se resolvió que, a los efectos de una ley prohibiendo los *injunctions* en relación con disputas obreras, un hospital no es una *industria* y que sus empleados no se dedican a una misma actividad comercial, oficio u ocupación y que por tanto otra ley sobre relaciones obreras tampoco era aplicable a los hospitales y a sus empleados. Aun cuando nos merezca respeto, no estamos obligados a seguir esta jurisprudencia, especialmente cuando

esta corte ha resuelto que ". . . un hospital que se dedica habitualmente a la hospitalización y tratamiento médico de pacientes y que proporciona esos servicios a cualquier paciente que le pague el precio convenido y que contrata la prestación de servicios, mediante pago, a los veteranos, es y debe ser considerado como una empresa o establecimiento a los efectos de las disposiciones del artículo 1803 del Código Civil." *Carrasquillo* v. *American Missionary Association*, et al., 61 D.P.R. 867, 875. En dicho caso, al igual que en el de autos, en cuanto a los hospitales antes mencionados, se arguyó que tratándose de instituciones caritativas o de beneficencia no podía considerárseles como negocios, pero resolvimos que "El hecho de que en esa misma institución se presten servicios gratuitos a personas insolventes, no le quita su carácter de establecimiento o empresa comercial."

La prueba presentada ante la Junta recurrida en las audiencias celebradas demostró que la gran mayoría de las recurrentes tienen contratos con el Fondo del Seguro del Estado, con los veteranos y que, si bien dedican un tanto por ciento de sus facilidades hospitalarias a casos de beneficencia, el por ciento mayor lo dedican a casos de pacientes pudientes.[3] Dicha prueba demostró que el único hospital que puede considerarse como exclusivamente una institución caritativa es el poco conocido "Castañer General Hospital" de la zona rural de Adjuntas, que no admite pacientes pudientes. Este hospital no es uno de los recurrentes, y por tanto, no estamos llamados a resolver en este caso si la Legislatura tuvo la intención de incluir instituciones de esta naturaleza dentro de los preceptos de la ley.

Es cierto que el caso de *Carrasquillo*, supra, fué uno de daños y perjuicios, pero no vemos razón alguna para limitar la doctrina allí expuesta a dicha clase de acciones. Está

---

[3] En el caso de *In re Dol's Estate*, 187 Pac. 428, se resolvió que una institución de la misma naturaleza que la aquí recurrente, Sociedad de Auxilio Mutuo, no es una "institución caritativa de beneficencia."

envuelta en la presente controversia una cuestión de alto interés público que afecta a un gran número de trabajadores.' Los bajos salarios pagados por algunos de los hospitales y clínicas, según demostró la prueba, son elocuente demostración de su insuficiencia para que los empleados afectados puedan mejorar sus condiciones de vida, salud y bienestar general, a tal extremo que algunas de las recurrentes admiten que dichos salarios podrían ser aumentados y que hasta habían aceptado convenios colectivos con sus trabajadores dejándolos pendientes de aprobación hasta que la Junta fijara los salarios mínimos.(⁴).

Pero es que la cuestión a resolver no depende de que los servicios profesionales de los médicos constituyan un negocio, sino si los recurrentes, como instituciones, lo ejercitan.

Eso no obstante, podemos decir que existen casos sosteniendo una doctrina contraria a la expuesta en el caso de *Yocum* v. *Feld,* supra, citado por las recurrentes, es decir, que el ejercicio de la profesión médica o legal es un negocio.(⁵)

La Corte Suprema Nacional en el caso de *American Medical Association* v. *U. S.,* 317 U. S. 519, en el cual la cuestión en controversia era si la American Medical Association violó el Sherman Anti-Trust Act al realizar ciertos actos tendentes a negarle al Group Health Corp., una corporación de beneficios médicos mútuos, los servicios médicos y otras facilidades de dicha asociación, si bien se abstuvo de resolver si la práctica de su profesión por un médico constituye comercio (*trade*), sí resolvió la cuestión envuelta en estos recursos al decidir que Group Health era una corporación que se dedicaba a negocios, diciendo a la página 528:

(⁴) Véanse págs. 88, 279, 97, 53, 231, 234, 345, 150, 165 y 169 de la transcripción de evidencia.

(⁵) *Semple* v. *Schwarz,* 109 S. W. 633; *People* v. *Garlock,* 11 N.Y.S. (2d) 82; *Ex parte Galusha,* 195 Pac. 406. *Cf. O'Neil* v. *United Producers & Consumers Co-op.,* 113 P. (2d) 645; *Marsh* v. *Adams,* 12 N.Y.S. (2d) 691; *East Hill Cemetery Co.* v. *Thompson,* 97 N. E. 1036, 1038.

"Group Health es una corporación de miembros que se dedica al negocio o comercio. Su actividad corporativa es la consumación del esfuerzo cooperativo de sus miembros para obtener para ellos y para sus familias servicio médico y hospitalización sobre la base de pagar por adelantado, prorrateándose los riesgos. Con estos fondos se emplean médicos y se obtiene hospitalización para los miembros y sus dependientes. El hecho de que sea una cooperativa y obtenga servicios y facilidades para sus miembros únicamente, no remueve sus actividades de la esfera de los negocios.

"Si, como sostenemos, la acusación imputa una sola conspiración para restringir y obstruir este negocio, imputa una conspiración para restringir los negocios o el comercio de acuerdo con el estatuto. Como bien dijo la Corte de Apelaciones, la profesión (*calling*) u ocupación de los médicos, individualmente, acusados, es inmaterial si el propósito y efecto de su conspiración constituye tal obstrucción o restricción del negocio de Group Health."

Y a la página 536, al resolver que las Leyes Clayton y Norris-La Guarida no eran aplicables a la controversia, se dijo que el interés de los peticionarios era "su oposición . . . a la forma en que (el Group Health) hacía negocios" que los peticionarios ". . . estaban interesados únicamente en impedir el negocio que hacía en forma corporativa el 'Group Health'."

En la opinión rendida en este mismo caso por la Corte de Apelaciones del Distrito de Columbia, se reconoce que existen autoridades que sostienen que "para ciertos fines hospitales de caridad no se dedican a negocios o a la industria" y se cita el caso de *Lichliter,* supra. Empero, también se citan varios casos(⁶) en los cuales se ha resuelto que el establecer y funcionar un hospital es un negocio.

(⁶)En *Jordan* v. *Tashiro,* 278 U. S. 123 se decidió que el funcionamiento de un hospital está incluído dentro del significado de las palabras "negocio" y "comercio" según se usan en un tratado autorizando a ciudadanos japoneses en los Estados Unidos "el ejercer un negocio" y de "hacer cualquier cosa incidental y necesaria para el negocio bajo los mismos términos que ciudadanos nativos"; *Lawrence* v. *Missen,* 173 N.C. 359, 91 S.E. 1036, 38, donde se dijo "El establecer y funcionar hospitales mediante paga es ahora una forma reconocida y establecida de hacer negocios"; en *Armendarez* v. *Hotel Dieu,* Tex. Civ. App., 145 S.W. 1030, 31, se resolvió que en tanto un hospital acepta pacientes que pagan con el fin de obtener ingresos para llevar a cabo su labor caritativa, está ejerciendo un negocio.

Contrario también a la doctrina establecida en el caso de *Lichliter* están las decisiones en los de *Wisconsin Employment Relations Board* v. *Evangelical Deaconess Soc.*, 7 N. W. (2) 590 (Wis. 1943) y *Northwestern Hospital* v. *Public Building Serv. Employees' Union*, 294 N. W. 215 (Minn. 1940).

En este último expresamente se citó el de *Lichliter* y aunque se distinguió por el hecho de que los hospitales de Pensilvania recibían fondos del Estado se dijo que a pesar de eso "dicha relación entre los hospitales y el estado no es suficiente para clasificar los primeros en la exención concedida al Estado." Se resolvió que una corporación caritativa con fines no pecuniarios que operaba un hospital público era un patrono dentro de la Ley de Relaciones del Trabajo y que su alcance no estaba limitado a las industrias, diciéndose a la pág. 217:

"El problema patrono-empleado es de más alcance y el imputar a la legislatura un propósito de proveer medios de arreglar las relaciones del trabajo en las industrias únicamente sería artificial. Todos sabemos que miles de personas están realizando sus deberes como empleados en hospitales, tales como el demandante, que son los mismos realizados por empleados en industrias privadas. La posición y derechos de los empleados en un hospital son tan importantes al bienestar de toda la comunidad como la del empleado técnico industrial. El hecho escueto es que los empleados dependen de sus puestos para ganarse la vida. Esto es así, bien sea el patrono un hospital de beneficencia o un fabricante de automóviles."

El lenguaje usado en el caso de *Wisconsin Employment Relations Board*, supra, no es menos fuerte y pertinente cuando la corte dice a la pág. 592: "¿Hay alguna razón para suponer que la legislatura tuvo la intención de que empleados de cocina (*kitchen-help*), por ejemplo, que trabajan en un hotel o restaurante deban tener el derecho de organizarse y solicitar mejores salarios y condiciones de trabajo a través de la Junta del Estado mientras que a aquéllos que realizan trabajo similar en un hospital debe impedírseles tratar de

conseguir similar objetivo a través de los mecanismos provistos por el Estado? Problemas surgen entre patronos y empleados tanto en instituciones caritativas como en las industrias y hay similar necesidad en cada uno de ellos de establecer métodos para llegar a un arreglo pacífico de las diferencias que existan.''

Resumiendo podemos decir que, debidamente enfocada la cuestión primordial envuelta en estos casos, el hecho de que en un hospital o clínica, privado o de beneficencia parcial, se presten servicios médicos por profesionales, no es el factor predominante. En dichas instituciones se utilizan empleados, que debido al salario inadecuado que perciben les coloca dentro del propósito de la ley de salario mínimo. No debemos establecer distinción o diferencia entre las condiciones de trabajo que deben prevalecer entre los trabajadores no técnicos de los hospitales y clínicas y las que deben prevalecer en otros negocios. La intención legislativa fué mejorar las condiciones económicas de los obreros y empleados para en esta forma beneficiarles en su vida, salud y bienestar general. No podemos aceptar que de ese propósito deban eliminarse los trabajadores de los hospitales y clínicas por el hecho de que en esas instituciones se presten servicios médicos, con fines caritativos o no. La atención, salud y el bienestar que estas instituciones brindan a sus pacientes, dependen, hasta cierto punto, de que los empleados y obreros que en ellas trabajan, a su vez puedan gozar del mínimo salario que su propia salud y bienestar requieren para que puedan rendir las obligaciones a ellos encomendadas. Resolvemos, por tanto, que la Junta recurrida actuó con poder y autoridad al fijar los salarios mínimos en su Decreto núm. 4.

Arguyen los recurrentes, por último, que el salario mínimo fijado no está sostenido por la prueba y que dicho salario y las condiciones de trabajo que establece el Decreto núm. 4, enmendado, son contrarios a la prueba, no habiendo ninguna que los sostenga. Hemos leído detenidamente la

transcripción de la evidencia presentada en las audiencias celebradas ante la Junta y además la prueba documental admitida y somos de opinión que carece de méritos la contención de los recurrentes. No sólo hubo prueba sustancial ante la Junta sino que la misma demuestra que los salarios fijados y las condiciones de trabajo establecidas pueden ser satisfechos y cumplidas por los recurrentes.

*Se desestiman los recursos y confirma el Decreto Mandatorio Núm. 4 promulgado por la Junta de Salario Mínimo de Puerto Rico con fecha 18 de mayo de 1943, y enmendado por la referida Junta en 15 de noviembre de 1943.*