PONCE CANDY INDUSTRIES, peticionaria, *v.* CORTE DE DISTRITO DE PONCE, HON. A. FIOL NEGRÓN, JUEZ, demandada; MONSERRATE SILVA, interventora.

Núm. 1747.—*Sometido:* Mayo 5, 1948. *Resuelto:* Diciembre 7, 1948.

418

*Leopoldo Tormes García*, abogado de la peticionaria; *Ramón Cancio, Pedro Santana* y *Joaquín Gallart Mendía*, abogados del Departamento del Trabajo y a su vez de la interventora, demandante en el pleito principal.

El Juez Asociado Señor Todd, Jr., emitió la opinión del tribunal.

Expedimos el auto en este caso para revisar la sentencia dictada por la Corte de Distrito de Ponce condenando a la peticionaria Ponce Candy Industries a pagar a Monserrate Silva, empleada de la peticionaria, la suma de $38.40, equivalente a medio sueldo correspondiente a cuatro semanas antes y cuatro semanas después de su alumbramiento por ser ella una madre obrera cubierta por las disposiciones de la Ley núm. 3 para proteger a las madres obreras, etc., aprobada el 13 de marzo de 1942 ((1) pág. 285), según enmendada por la Ley núm. 398, aprobada el 13 de mayo de 1947 ((1) pág. 767).

Los hechos en este caso no están en controversia. Monserrate Silva, casada pero quien está separada de su esposo, trabaja como obrera con la peticionaria desde hace más de dos años con un sueldo de $9.60 semanales; quedó embarazada como resultado de relaciones maritales que tuvo con otro obrero de la peticionaria; próxima a dar a luz notificó el hecho de su embarazo, con el correspondiente certificado médico, a la peticionaria a fines de febrero de 1947; a los cuatro meses de haber dado a luz ella volvió a trabajar con la peticionaria y le reclamó el pago de la mitad de su sueldo correspondiente a las cuatro semanas anteriores y posteriores a su alumbramiento; al negarse la peticionaria a efectuar el pago ella entabló la presente acción en la corte municipal, acogiéndose a la Ley núm. 10 de 1917 ((2) pág. 217).

Las secciones 1 y 2 de la Ley núm. 3 de 1942, supra, disponen lo siguiente:

"Sección 1.—*Exposición de Motivos.*—La legislación vigente en Puerto Rico no provee protección alguna para las madres obreras. En los convenios colectivos e individuales de trabajo tampoco suele incluirse disposición alguna para garantizar un período de descanso a las madres obreras en las semanas que preceden ni en las que siguen al alumbramiento. Las jornadas ininterrumpidas de trabajo durante este período constituyen un positivo peligro para la salud y la vida de las obreras. La ciencia médica aconseja la observancia de un período de descanso en estos casos. La legislación moderna del trabajo se orienta en el sentido de proveer a las madres obreras este indispensable descanso.

"Las obreras puertorriqueñas que trabajan en oficinas, establecimientos comerciales e industriales y en empresas de servicio público necesitan de los beneficios de esta medida humanitaria, que es indispensable para la protección de su salud y la conservación de su vida. Se declara por la presente que la política pública de esta Ley es, mediante el ejercicio de las facultades de la Asamblea Legislativa de Puerto Rico para decretar leyes para la protección de la vida, la salud y la seguridad de empleados y obreros, establecer el derecho de las madres obreras a un descanso que comprenderá cuatro semanas antes del alumbramiento y cuatro semanas después."

"Sección 2.—(Enmendada por la Ley núm. 398 de 1947, Leyes de Puerto Rico, pág. 769).—Las obreras en estado grávido tendrán derecho a un descanso que comprenderá cuatro semanas antes del alumbramiento y cuatro semanas después. En este período se prohibe en oficinas, establecimientos comerciales e industriales y empresas de servicio público, el trabajo de obreras en estado grávido.

"Será obligación del patrono, asimismo, pagar a las madres obreras la mitad del sueldo, salario, jornal o compensación que estuviere recibiendo por su trabajo durante el mencionado período de descanso. Este pago se hará en la misma forma y términos establecidos para el pago de los sueldos, salarios, jornales o compensaciones corrientes; *Disponiéndose*, que para computar la mitad del sueldo, salario, jornal o compensación se tomará como base única el promedio de sueldo, salario, jornal o compensación que hubiera estado recibiendo durante los tres meses anteriores al comienzo del período de descanso.

"Si el alumbramiento se produjere después de las cuatro semanas siguientes a la fecha en que la obrera hubiere comenzado a gozar del descanso, o si sobreviniere a ésta alguna enfermedad producida directamente por el alumbramiento y que le impidiere tra-

bajar por un término que exceda de cuatro semanas, a contar desde el día del alumbramiento, el patrono estará obligado a ampliar el período de descanso por un término que no excederá de cuatro semanas adicionales siempre que antes de expirar el período de descanso se le presente certificación médica acreditativa de tales hechos. En este caso, la obrera no tendrá compensación adicional, pero se le reservará el empleo.''

Sostiene la peticionaria que esta ley es inconstitucional pues le priva de su propiedad sin el debido procedimiento de ley al obligarla a pagar a la madre obrera un salario por el cual no ha rendido labor alguna durante ocho semanas y en violación del artículo 2 del Acta Orgánica, cuyo primer párrafo dispone que ''No se pondrá en vigor en Puerto Rico ninguna ley que privare a una persona de la vida, libertad o propiedad sin el debido procedimiento de ley, o que negare a una persona de dicha isla la protección igual de las leyes.''

En cuanto a los hechos de este caso se refiere, creemos que la disposición citada debe interpretarse conjuntamente con el párrafo diez del mismo artículo 2 del Acta Orgánica, dispositivo de que ''Nada de lo contenido en esta Ley será interpretado en el sentido de limitar la facultad de la Asamblea Legislativa para decretar leyes para la protección de la vida, salud y seguridad de empleados y obreros.''

Esta disposición de nuestra Carta Orgánica constituye un reconocimiento expreso del Congreso a nuestra Asamblea Legislativa en cuanto a su facultad para aprobar leyes, dentro de su poder de reglamentación (*police power*), para la protección de la vida, salud y seguridad de empleados y obreros. Véase *J. B. Nieva & Co.* v. *Domenech, Tesorero,* 46 D.P.R. 158, 161.

Ya ha sido resuelto que legislación disponiendo salarios mínimos y horas máximas de trabajo no infringe la cláusula del debido procedimiento. *West Coast Hotel Co.* v. *Parrish et al.,* 300 U.S. 379; *United States* v. *Darby,* 312 U.S. 100. Al mismo efecto se ha sostenido, bajo el poder de reglamen-

tación y por motivos de salud y bienestar públicos, la validez de legislación ordenando un día de descanso a la semana sin paga para los trabajadores. *People* v. *C. Klinck Packing Co.*, 108 N.E. 278 (N. Y., 1915); Ann. Cas. 1916 D. 1058; L.R.A. 1915 F. 831; *Compañía Popular* v. *Unión de Empleados de Transporte et al.*, pág. 179, ante; Véase *Hennington* v. *Georgia*, 163 U.S. 299.

Recientemente sostuvimos la validez del Decreto Mandatorio número 12 dictado por la Junta de Salario Mínimo en el que se fijan salarios mínimos, períodos máximos de labor y condiciones de trabajo para los empleados del servicio de transporte de Puerto Rico. *American Railroad Company of Puerto Rico* v. *Junta de Salario Mínimo*, 68 D.P.R. 796. En dicho caso se alegó, entre otros motivos, que el mencionado decreto era nulo por haberse dispuesto en el mismo que todo empleado tendría derecho a vacaciones con sueldo completo, a razón de un día por cada cuatro semanas consecutivas en cada una de las cuales haya trabajado más de cuatro días de no menos de seis horas de labor cada uno. Rechazamos la alegada nulidad y dijimos, a las págs. 801-2: "No obstante, las vacaciones fijadas, que como hemos visto ascienden a lo sumo a trece días al año, caen dentro del espíritu y propósito que animó al legislador a aprobar la Ley de Salario Mínimo. Ya hemos indicado que éstos son, en esencia, velar por la salud y seguridad de los empleados y obreros y proteger a éstos en sus medios de vida, en tal forma que no se destruyan las fuentes mismas de empleo y trabajo. Los intervalos destinados al reposo son necesarios para evitar el desgaste físico, el agotamiento de las energías, la vejez prematura y las enfermedades del trabajador. Si bien aparentemente al concederlas se perjudica el patrono, a la larga no hay duda de que redundan en beneficio de éste. Mientras más saludables y fuertes sean los obreros de una industria, mayor será su producción y mejor su labor, menores serán sus ausencias y menor será también

el número de accidentes del trabajo. Vacaciones con paga por períodos largos indudablemente redundan en perjuicio de la industria y los negocios. Empero, las aquí concedidas no son irrazonables—13 días al año. Por otra parte, ese corto período de vacaciones anuales a sus empleados no priva a la peticionaria de su propiedad sin el debido proceso de ley, pues al regresar de ellas a sus faenas, con nuevo entusiasmo y con nuevo vigor, éstos compensarán tal vez con creces todo aquello que dejaron de hacer o producir para su patrono."

El mismo razonamiento, pero con mayor fundamento es aplicable al caso de autos.

En la Exposición de Motivos, incluída en la sección 1ª de la Ley núm. 3 de 1942, supra, se hizo constar que "Se declara por la presente que la política pública de esta Ley es, mediante el ejercicio de las facultades de la Asamblea Legislativa de Puerto Rico para decretar leyes para la protección de la vida, la salud y la seguridad de empleados y obreros, establecer el derecho de las madres obreras a un descanso que comprenderá cuatro semanas antes del alumbramiento y cuatro semanas después." Ha querido, pues, la Legislatura hacer uso de la facultad concedídale en el párrafo diez del artículo 2 del Acta Orgánica y, al hacerlo, ha colocado a las madres obreras en una clasifiación especial y distinta a la de los demás empleados y obreros en general. Que el Estado puede hacer esa clasificación especial, no está sujeto a discusión. La piedra angular de este principio se estableció judicialmente en el caso de *Muller* v. *Oregon*, 208 U.S. 412, 421-2, (1908) en el cual el más alto tribunal de la nación se expresó en esta forma:

"Es patente el hecho de que la estructura física de la mujer y el cumplimiento de sus funciones maternales la colocan en posición desventajosa en la lucha por la subsistencia. Esto es especialmente cierto cuando descansan sobre ella las obligaciones de madre. Aun cuando no las tenga, según el testimonio copioso de la Asociación Médica, el continuar por largo tiempo de pie en su trabajo, repi-

tiendo esto de día en día, es cosa que tiende a producir efectos perjudiciales en su organismo y como se necesitan esencialmente madres saludables para que la prole sea vigorosa, el bienestar físico de la mujer viene a ser una cuestión de interés público y de cuidado a fin de preservar la fortaleza y el vigor de la raza. . . Es imposible cerrar los ojos ante el hecho de que aun mira ella hacia su compañero y que depende de él . . . que su estructura física y el debido cumplimiento de sus funciones maternales—teniendo en cuenta no simplemente su salud propia, sino el bienestar de la raza, justifican la legislación para protegerla de la codicia así como de la pasión del hombre. Las limitaciones que este estatuto fija a sus facultades contractuales, a su derecho a entrar en arreglo con su patrono en cuanto al tiempo que habrá de trabajar, no se imponen exclusivamente para su beneficio, sino también para beneficio de todos. El empleo de muchas palabras no hace que esto sea más claro . . . Esta diferencia justifica una diferencia de legislación y sostiene aquello que tiene por fin compensar algunas de las obligaciones que pesan sobre ellas.''

Esta justiciera doctrina fué ratificada en *Quong Wing* v. *Kirkendall*, 223 U.S. 59; *Riley* v. *Massachusetts*, 232 U.S. 671; *Miller* v. *Wilson*, 236 U.S. 373; *Bosley* v. *McLaughlin*, 236 U.S. 385, y por último en *West Coast Hotel Co.* v. *Parrish et al.*, supra, en el cual se afirmó que el Estado tiene un especial interés en la protección de las mujeres obreras, diciéndose, a la pág. 398, ''¿Qué puede estar más íntimamente relacionado con el interés público que la salud de las mujeres y su protección contra patronos inescrupulosos y astutos?'', resolviéndose, además, que la Legislatura ''está en libertad de reconocer grados de perjuicios y puede limitar sus restricciones a aquellas clases de casos donde la necesidad se crea más clara'', y que este principio ''ha sido repetidamente aplicado a legislación que separa a las mujeres, y determinadas clases de mujeres, en el ejercicio del poder protector del Estado. *Miller* v. *Wilson*, supra, pág. 384; *Bosley* v. *McLaughlin*, supra, págs. 394, 395; *Radice* v. *New York*, 264 U.S. 292, 295–8. Sus necesidades relativas frente al mal, no menos que la existencia del mal mismo, es materia para el criterio legislativo.''

El criterio de nuestra Asamblea Legislativa, expresado en la Ley núm. 3 de 1942, determinó que existía un mal en Puerto Rico, a saber, que constituye un positivo peligro para la salud y la vida de las mujeres obreras el permitir que trabajen durante un período de ocho semanas, o sea cuatro antes y cuatro después del alumbramiento. Para remediarlo, estatuyó el derecho a un descanso durante ese período con media paga. Bajo la precaria situación económica prevaleciente en nuestra clase trabajadora en general, el ordenar ese período de descanso sin paga, sería ilusorio. *Cardona* v. *Corte*, 62 D.P.R. 61; *Hospital San José* v. *Junta de Salario Mínimo*, 63 D.P.R. 747, 752–53. Las madres obreras, además de los gastos corrientes de subsistencia en que incurren durante el período de descanso, tienen que afrontar los gastos extraordinarios que todo alumbramiento trae consigo. Consideramos que al concederles medio sueldo durante el período de descanso nuestra Asamblea Legislativa ejercitó razonablemente su poder de reglamentación protegiendo así, no sólo la salud y la vida de las obreras, sino en beneficio del propio patrono y de la comunidad en general. *Cardona* v. *Corte*, supra; *West Coast Hotel Co.* v. *Parrish et al.*, supra; *Compañía Popular* v. *Corte*, 63 D.P.R. 121, 132. Beneficia al patrono porque asegurando la salud de sus obreras podrá retenerlas después del período de descanso y aumentará su producción. Obligarlas a trabajar, durante el período anterior y posterior a su alumbramiento, cuando su estado grávido les impide realizar normalmente sus deberes, indefectiblemente redundaría en un perjuicio para el patrono. Beneficia a la comunidad porque no sólo protege la salud y la vida de la obrera sino que también la de su hijo.

Tenemos, además, el hecho de que la Ley núm. 3 de 1942 estaba en vigor cuando la peticionaria empleó a la interventora. Tenía, por tanto, conocimiento de la obligación que le imponía la ley de pagar el medio sueldo durante el

período de descanso. No tenía, sin embargo, la obligación de contratar mujeres para el trabajo de su fábrica de dulces. Empero, si lo hizo, conociendo la ley, no puede quejarse. Como dijo el juez Holmes en su opinión disidente en *Adkins* v. *Children's Hospital,* 261 U.S. 525, 570, citado con aprobación en *West Coast Hotel Co.* v. *Parrish,* supra, págs. 396-7: " ' . . . Esta ley no obliga a nadie a pagar algo. Simplemente prohibe el empleo a tipos inferiores a aquéllos fijados como el requisito mínimo de salud y derecho a la vida. No es arriesgado suponer que las mujeres no serán empleadas ni a los tipos más bajos permitidos a menos que ellas se los ganen, o a menos que el negocio del patrono pueda absorber la carga. En resumen, en carácter y funcionamiento, esta ley es igual a cientos de leyes llamadas leyes de policía que han sido sostenidas' ".

En el caso de *American Railroad Co.* v. *Junta de Salario Mínimo,* supra, resolvimos que la concesión, a los empleados del servicio de transporte, de trece días al año de vacaciones, con paga completa, no era irrazonable. Tampoco constituye un ejercicio irrazonable del poder de reglamentación del Estado y en armonía con la legislación social moderna, el conceder ocho semanas con medio sueldo (que equivalen a 28 días con sueldo completo) a las madres obreras durante dicho período de descanso.

Los casos de *People* v. *Chicago, Milwaukee and St. Paul Railway Co.,* 306 Ill. 486; 138 N.E. 155 y *McAlpine* v. *Dimick,* 157 N.E. 235,(¹) citados por la peticionaria son claramente distinguibles. En estos casos se resolvió que era nula una ley que prohibía a un patrono rebajar del salario de sus empleados la parte correspondiente a dos horas utilizadas por ellos para ir a votar el día de las elecciones. Empero, en el de *People* v. *Ford Motor Co.,* 63 N.Y.S.2d 697

---

(¹) Un caso similar a éstos es el de *Commonwealth of Kentucky* v. *Illinois Central R. R. Co.,* 305 Ky. 632 (1948), *certiorari* denegado por la Corte Suprema de Estados Unidos en junio 14, 1948 (334 U.S. 843).

(1946), se sostuvo la validez de una ley similar. Dichas leyes, sin embargo, no tenían relación alguna con la salud o bienestar de los empleados y obreros. No obstante sus decisiones en los casos antes mencionados, la propia Corte Suprema de Illinois los distinguió en el de *Zelney* v. *Murphy,* 56 N.E.2d 754, 757-8 (Ill., 1944), al considerar válida una ley sobre compensación por desempleo, expresándose así: "Desde luego, estos casos no serían decisivos en cuanto a la Ley bajo consideración aquí y especialmente en vista de la creciente comprensión de las necesidades públicas y de la necesidad de buscar base para que racionalmente se pongan de acuerdo los derechos individuales y el bienestar público. Las complejidades cada día mayores de nuestros intereses económicos nos han llevado inevitablemente al empleo de más medidas reglamentarias con el fin de proteger al individuo, de suerte que se asegure el bienestar público salvaguardando la estructura económica sobre la cual depende la felicidad de todos."

Arguye, por último, la peticionaria que las palabras "madre obrera" usadas en la Ley núm. 3 de 1942, se refieren a una madre legítima y, por tanto, que dicha ley no es aplicable a un caso como el de la interventora por haber sido su embarazo el resultado de relaciones adulterinas. Según admite la peticionaria, la ley no define la frase "madre obrera". Por el contrario la sección 8 define la palabra "obrera" diciendo que: "A los fines de esta Ley, se entenderá por obrera a *toda mujer* empleada mediante sueldo, salario, jornal o cualquiera otra manera de compensación en cualquier oficina, establecimiento comercial o industrial o empresa de servicio público." (Bastardillas nuestras.) La ley no hace distinción alguna entre madre legítima y madre ilegítima y no debemos por interpretación judicial limitar el alcance de un estatuto que tiene por finalidad la protección de la salud y de la vida de las madres obreras en general. La intención legislativa quedó claramente expuesta

al hacerse aplicable la ley a "toda mujer", sin limitación de clase alguna. El artículo 60 del Código de Enjuiciamiento Civil y la jurisprudencia interpretándolo antes de ser enmendado por la Ley núm. 77 de julio 20 de 1921 (pág. 703), citados por la peticionaria, no son, por tanto, aplicables al caso de autos.

*Debe desestimarse la petición y anularse el auto expedido.*

El Juez Presidente Interino Sr. De Jesús no intevino.